**FILED**
US DISTRICT COURT
WESTERN DISTRICT
OF ARKANSAS

Sep 14, 2018

OFFICE OF THE CLERK

## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF ARKANSAS

**JOHN DOE**                                                          **PLAINTIFF**

**VS.**                          18-5182

**UNIVERSITY OF ARKANSAS-**                          **DEFENDANTS**
**FAYETTEVILLE; BOARD OF TRUSTEES**
**OF THE UNIVERSITY OF ARKANSAS;**
**TYLER R. FARRAR, individually and in his official**
**capacity; JON COMSTOCK, individually and in his**
**official capacity, ERIC SPECKING, individually**
**and in his official capacity; DINA WOOD,**
**individually and in her official capacity; and**
**KRISTIN BARNETT, individually and in her**
**official capacity.**

## COMPLAINT

Plaintiff John Doe[1] (hereafter, "John Doe" or "Plaintiff"), by and through his attorneys Williams & Anderson PLC, maintains this complaint against Defendants University of Arkansas-Fayetteville (hereafter, "University"); Board of Trustees of the University of Arkansas (hereafter "Board of Trustees"); Tyler R. Farrar, individually and in his official capacity; Jon Comstock, individually and in his official capacity; Eric Specking, individually and in his official capacity; Dina Wood, individually and in her official capacity; and Kristin Barnett, individually and in her officially capacity. For his complaint, Plaintiff alleges as follows:

---

[1] Plaintiff has filed, contemporaneously with this complaint, a motion to proceed pseudonymously

### NATURE OF ACTION

1.      At all times described in this Complaint and relevant thereto, Plaintiff was a student at the University of Arkansas-Fayetteville.   Plaintiff brings this action for declaratory and injunctive relief, damages and attorney's fees arising out of the University's unlawful conduct and cover-up of the University's erroneous decision that found John Doe sexually assaulted another student at the University.

2.      Even considering the defects and shortcomings of its policies for investigating Title IX allegations, the University failed to adhere to even the basic tenets of its own guidelines and regulations. The University summarily refused not only to follow its own Title IX policy, but conducted the subsequent investigation to achieve a predetermined false and unsupported result with deliberate disregard of the consequences to John Doe and the grievous harm that he suffered and continues to suffer to this day.

3.      The University's unlawful actions resulted in John Doe, a three-year Chancellor's and Dean's List honoree who graduated with a 3.90 GPA, experiencing significant reputational damage and economic loss due to the lack of confidentiality and numerous violations of his substantive and procedural due process rights.   Given the blatant lack of evidence, violations of due process, and the University's pattern and practice of violating its own Title IX policies and procedures, John Doe is entitled to have the University's false, malicious, and injurious decision vacated and for all monetary damages arising therefrom.

## *JURISDICTION AND VENUE*

4.     This Court has subject matter jurisdiction over Plaintiff's federal claims under 28 U.S.C. §§ 1331 and 1367 because the claims either involve questions arising under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-88 ("Title IX") or denial of Fourteenth Amendment Due Process under 42 U.S.C. § 1983.

5.     This Court has personal jurisdiction over all Defendants because the actions giving rise to Plaintiff's lawsuit occurred in Fayetteville, Arkansas.

6.     Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## *PARTIES*

7.     Plaintiff, John Doe is a citizen and resident of Arkansas and was a student at the University of Arkansas during the relevant time period.

8.     Defendant University of Arkansas-Fayetteville (hereafter "University") is an Arkansas collegiate institution and public university located in Fayetteville, Arkansas. The University receives federal funding and assistance.

9.     Defendant Board of Trustees of the University of Arkansas (hereafter "Board") operates, governs, and has legal control and responsibility for the functions of the University of Arkansas-Fayetteville.

10.    Defendant Tyler R. Farrar (hereafter "Farrar") is the Title IX Coordinator for the University.  Farrar oversees, implements, and enforces the University's Title IX policy and is responsible for training and supervising University staff and employees during Title IX investigations.

3

11.     Defendant Jon Comstock (hereafter "Comstock") was the University's chosen Title IX Hearing Panel Chairman for the allegations against John Doe.

12.     Defendant Eric Specking is the Director of Undergrad Recruitment for the University College of Engineering, and was one of the Title IX Hearing Panel Members for the allegations against John Doe.

13.     Defendant Dina Wood is an agent or representative of the University and was one of the Title IX Hearing Panel Members for the allegations against John Doe.

14.     Defendant Kristin Barnett was the Coordinator of Student Conduct Investigations and Title IX Investigator for the University during the relevant time period of John Doe's Complaint.

15.     John Doe and Defendants are sometimes hereinafter collectively referred to as the "Parties."

## FACTS

### A. University of Arkansas

16.     Upon information and belief, the University of Arkansas is the flagship of the University of Arkansas System.   The University is a public land-grant, doctoral research institution that accepts federal funding located in Fayetteville, Arkansas.   The University's motto is "*To Advance with Truth as Our Leader*."   During the events herein, John Doe was a student at the University of Arkansas.

17.     John Doe was accepted and enrolled in the University of Arkansas in the Fall Semester of 2015.

18.     The Board of Trustees, through its agents and representatives at the University, is responsible for establishing rules and regulations regarding government and discipline within the University.  The Board of Trustees has ultimate responsibility for the safety and well-being of University students.

19.     At all times alleged herein, the University and the other named Defendants were operating under the authority and supervision of the Board of Trustees.

### B. Title IX and the Cleary Act

20.     Title IX applies to all public and private educational institutions that receive federal funds, including colleges and universities. The statute prohibits discrimination on the basis of sex in a school's "education program or activity," which includes all of the school's operations. 20 U.S.C. §§ 1681(a), 1687. A school specifically agrees, as a condition of receiving federal funds, to operate all of its programs and activities in compliance with Title IX and the Department of Education's Title IX regulations. This agreement is known as an "assurance of compliance." 34 C.F.R. § 106.4(a)-(c).

21.     The University is a recipient of federal funds, is bound by Title IX and its regulations, and upon information and belief, has executed an assurance of compliance.

22.     Sexual harassment is a form of sex discrimination prohibited by Title IX. Sexual harassment is defined for Title IX purposes as unwelcome conduct of a sexual nature that includes sexual intercourse, sexual assault, and rape.

23.     Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish

grievance procedures providing for the prompt and equitable resolution of student complaints alleging any action which would be prohibited by" Title IX or regulations thereunder.  34 C.F.R. § 106.8(b); 28 C.F.R. § 54.135(b).

24.    The procedures adopted by a school covered by Title IX must not only "ensure the Title IX rights of the complainant" but must also "accord []due process to both parties involved…"  *Id.*

25.    The "prompt and equitable" procedures that a school must implement to "accord due process to both parties involved" must include, at a minimum:

- Notice of the procedure;

- Application of the procedure to complaints alleging sexual harassment;

- Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence;

- Reasonably prompt timeframes for the major stages of the complaint process; and

- Notice to the parties of the outcome of the complaint.

*Id.* at 19-22.

26.    A school also has an obligation under Title IX to make sure that all employees involved in conducting the procedures have "adequate training as to what conduct constitutes sexual harassment" which includes "alleged sexual assaults." *Id.* at 21.

27.    Similar to Title IX, the Cleary Act mandates that schools receiving federal funding create and publish procedures for complaints involving charges of sexual assault.

A school is required to have a written statement of policy detailing such procedures. 20 U.S.C. § 1092(f)(8)(A)(ii).

### C.     The Events of October 29, 2017

28.     The allegations giving rise to the erroneous finding of violation by the University stem from activities on the night of October 28, 2017 and early morning of October 29, 2017.

29.     At that time, the Plaintiff was a senior at the University.

30.     Prior to the events of October 29, 2017. Complainant Jane Roe[2] and John Doe were socially friendly but had never been in a romantic relationship.  John Doe and Jane Roe were not in any University classes or programs together and did not encounter each other on campus.

31.     The friendship between John Doe and Jane Roe included her picking him up and going to his house on September 8, 2017 to "hang out."   Jane Roe also accepted an invitation to John Doe's residence on October 22, 2017 to study.  The Parties also sent messages to one another on social media, including Snapchat and Facebook.

32.     In Jane Roe's allegations, she claimed that she attended a Halloween-themed party with friends on Saturday, October 28, 2017.

33.     Jane Roe stated that she became bored with the Halloween-themed party and decided to contact John Doe.

---

[2] Although Jane Roe's allegations are entirely false, Plaintiff seeks to use a pseudonym to protect her identity.

34.     Jane Roe sent John Doe a text message at 11:13 p.m. that said "whats up." At 11:31 p.m., Jane Roe sent him a picture of her in her Halloween costume holding a beer.

35.     John Doe and Jane Roe decided to "hang out" after sending several text messages at approximately 11:56 p.m.

36.     At 11:58 p.m., John Doe indicated that he was about to order an Uber to return to his off-campus residence. John Doe told Jane Roe that he would be home by 12:15 a.m. Jane Roe responded, "I'm gonna call Uber at the end of this set" and "which is one more song."

37.     According to text messages, Jane Roe asked for John Doe's address at 12:07 a.m., presumably to enter it into an Uber request. At 12:10 a.m., she texted him and stated "I'm leaving" and at 12:16 a.m., she stated "in Uber" and "on way."

38.     At 12:22 a.m., Jane Roe arrived at John Doe's residence.

39.     Jane Roe confirmed during the course of the investigation that when she was texting John Doe she was "not drunk" and that she did not drink any additional alcohol while at John Doe's residence.

40.     While Jane Roe was at John Doe's residence, she suggested they go to his room to talk. John Doe sat on his bed and Jane Roe sat in a chair in his room.

41.     The two engaged in friendly conversation and watched an episode of "The Office" on his computer.

42.     Eventually, Jane Roe turned off the lights in John Doe's room, came to sit by him on the bed, and began kissing him.

43.     John Doe and Jane Roe continued kissing and rubbing each other on the bed.  Jane Roe then stated several times, "I want you inside of me" and "I want you to fuck me."

44.     John Doe eventually asked her, "Do you want to have sex?" to which she replied, "Yes."

45.     Jane Roe removed her clothes and John Doe removed his clothes.

46.     She continued to participate in the sexual encounter, stating things like "That feels good" and "Do you like that?"

47.     After the sexual encounter had ended, John Doe and Jane Roe laid on John Doe's bed and cuddled.

48.     Jane Roe laid her head on John Doe's chest and the two talked about previous relationships they had experienced and how they felt wronged by the person they had been dating.

49.     Specifically, Jane Roe discussed her ex-boyfriend, their struggles, and her disappointment at the end of their relationship.

50.     John Doe then asked Jane Roe why she had texted him earlier in the evening.  Jane Roe responded, "Do you really want to know?"  John Doe stated that he did, and Jane Roe stated that she had had a "crush" on him since the summer of 2013.

51.     John Doe then told Jane Roe that he would soon have to leave to go pick up friends that were downtown and needed a ride.  He suggested they go get food, go pick up his friends so that she could meet them, and then he would take her back to her apartment.

9

52.    Jane Roe began to protest and try to talk John Doe into staying with her at the apartment instead of picking up his friends, saying things like "Choose me over your friends" and "I need this tonight."

53.    When Jane Roe realized that her attempts were not going to be successful, she became angry and stated, "I am tired of compromising for guys. I can't keep doing this. I give way too much and get nothing in return. If you take me home, I'm never going to speak to you again." She also stated, "I'm not going to leave" and "You can't make me."

54.    When John Doe was insistent that they were leaving, Jane Roe became irate and began yelling things like "I'M JUST GOING TO WALK HOME" and "THIS ALWAYS HAPPENS TO ME! THIS IS ALWAYS THE CASE WITH GUYS."

55.    John Doe again stated that he would take her home and she did not have to walk. She then started crying and stated, "Nothing matters, and nobody cares about me." She also said, "I am just going to kill myself." John Doe, who believed this statement was just an attempt to manipulate him, told her that people did care about her but they still had to leave.

56.    John Doe's roommate, who had been asleep, stated that he was awakened by a Jane Roe's voice yelling and making angry statements. The roommate stated that Jane Roe was not slurring her words nor did she sound drunk.

57.    John Doe ultimately took her home, despite her protests.

58.    On the drive home, Jane Roe had to provide directions to John Doe for how to get to her apartment because he had never been there before.

59.     Sometime after Jane Roe returned to her residence she cut her wrists in an apparent suicide attempt.

60.     Jane Roe's roommate's boyfriend found Jane Roe in her room bleeding from her self-induced wounds and called 911. Jane Roe told the 911 operator on two separate occasions that she was not intoxicated, and the roommate's boyfriend told the operator that her self-induced cutting was the result of a recent breakup that did not occur that day.

61.     At the hospital, Jane Roe denied needing to perform a rape kit and, upon information and belief, did not make any allegations of nonconsensual sexual conduct.

62.     Eventually, presumably as an explanation for her erratic behavior and self-harm, Jane Roe made a false claim of sexual assault against John Doe based solely on her alleged claim of being incapacitated at the time of the consensual sexual encounter.

63.     Jane Roe's allegations contained no allegation of sexual assault by force, threat or intimidation.

### D. Title IX Investigations at the University of Arkansas

64.     Upon his acceptance, the University provided John Doe with copies of its school policies (the "Policies") and the Code of Student Life ("the Code"). The Policies and the Code describe the rights afforded students by the University and their corresponding responsibilities as members of the University.

65.     The Policies and the Code implemented by the University and the Board of Trustees specifically establish the University's standards for acceptable conduct, and also

describe the procedures by which the University investigates and adjudicates any alleged violation of the Policies or the Code.

66.     The Code expressly represents that all students "shall be presumed not responsible for a violation until determined to be responsible by a preponderance of evidence; for a student to be found responsible for a violation, the evidence must indicate that it is more likely than not that the violation occurred."

67.     The Policies also contain special provisions for alleged violations of sexual misconduct, including Policy 418.1 – Sexual Assault and Sexual Harassment (hereafter, "Policy 418.1"), and Policy 214.1 – Non-Discrimination, the University policies at issue in this matter.

68.     The Code of Student Life sets forth the University's policies and procedures for the adjudication of disciplinary proceedings, including claims of sexual assault and sexual harassment.

69.     In the Code of Student Life section involving disciplinary proceedings, the University warrants that "Subject to all other provisions of the Code or University Policy, any student charged with an infraction under this Code shall be presumed not responsible for a violation until determined to be responsible by a preponderance of the evidence; for a student to be found responsible for a violation, the evidence must indicate that it is more likely than not that a violation occurred."

70.     The Code further states, "For all student on student matters involving all forms of harassment and violence that are sexual in nature, including, but not limited to, stalking, voyeurism, exhibitionism, verbal or physical abuse or threats thereof, intimate

partner or domestic partner violence, dating violence, and sexual assault (collectively known as Sexual Misconduct) proceedings may be found in the Fayetteville Policies and Procedures 418.1."

71.    Sexual Assault is defined in Policy 418.1 as:

> An actual or attempted sexual contact with another person without that person's consent. Sexual assault includes, but is not limited to involvement in any sexual contact when the victim is unable to consent; intentional and unwelcome touching of, or coercing, forcing, or attempting to coerce or force another to touch a person's intimate parts (defined as genital area, groin, inner thigh, buttocks, or breast); and sexual intercourse without consent. Acts defined as sexual assault include rape, date rape, acquaintance rape, and gang rape, but may also include sexual touching of another person against his or her will, and forcing an unwilling person to touch another person sexually. Sexual assault occurs when such acts are committed either by force, threat, or intimidation, or through the use of the victim's mental or physical helplessness, *of which the assailant was aware or should have been aware.*

Fayetteville Policies and Procedures, 418.1(L) (emphasis added).

72.    In consideration for his tuition and attendance at the University, John Doe received assurances from the University that it would follow and comply with the numerous policies and procedures adopted and put forth by the school, including those contained in the Code and the Policies.

73.    The University is mandated to follow a formal adjudicative process, including pre-hearing meetings for the complainant and respondent to discuss the charges and the process.

74.     The preliminary investigation of a Title IX complaint is to be done by the Title IX coordinator, who has a duty to "make an initial assessment regarding whether a potential Title IX violation has occurred."

75.     The Title IX coordinator then refers the matter to a Title IX investigator who has a duty to conduct a "comprehensive investigation" into the allegations.

76.     Upon conclusion of the "comprehensive investigation" by the Title IX investigator, a summary of the investigation is provided to the Title IX coordinator.

77.     The Title IX Coordinator provides the Investigation Summary to both parties, who then have three days to provide additional relevant information or to request a meeting with the Title IX Coordinator.

78.     The Title IX Coordinator then compiles all materials submitted, including the Investigation Summary and anything submitted thereafter, into an Investigative Report.

79.     The Title IX Coordinator then reviews the Investigative Report and determines whether, based on a preponderance of the evidence, the conduct at issue constitutes a violation of Title IX.  The Title IX Coordinator memorializes his or her findings in a Letter of Decision.

80.     If either party disagrees with the conclusion of the Title IX Coordinator, that party can file an appeal to a Hearing Panel by providing a written appeal within five days of receipt of the decision.

81.     Thereafter, a three-person Hearing Panel is selected. Recognizing the need for qualified and trained individuals to adjudicate these highly sensitive disputes, the

14

Policy provides, "Only individuals who have participated in in-person Title IX hearing panel training conducted by the University of Arkansas or comparable in-depth panel training will be permitted to serve on the Title IX Appeal Hearing Panels."

82.     The process for the hearing before the Hearing Panel is as follows:

> The Hearing Panel will conduct a hearing during which it will interview and question the Complainant. . . the Respondent, and any witnesses whose testimony the Hearing Panel deems relevant. The hearing will begin with a statement from the Title IX Coordinator or designee regarding his/her decision, rationale for the decision, and explanation of sanctions, if any. The parties will not be allowed to personally question or cross-examine each other or the Title IX Coordinator during the hearing, but will be allowed to question witnesses and will be allowed to hear the testimony of the other party via closed circuit television or other means. The Chair will resolve all questions concerning procedure or the admission of evidence or testimony including the relevancy and reliability of the evidence and testimony. All participants at the hearing are expected to provide truthful testimony. The Complainant and/or alleged victim have the option not to be in the same room with the alleged Respondent during the hearing. Any party may choose not to testify or appear before the Hearing Panel; however, his/her exercise of that option will not preclude the Hearing Panel from making a determination regarding the Complaint filed against the Respondent.

Policy 418.1, XIII (A)(5)(b).

83.     Following the conclusion of the hearing, the Hearing Panel must determine by a majority vote, whether the evidence establishes that it is more likely than not that the Respondent committed a violation of the policy. Policy 18.1, XIII (A)(5)(c).

### E. Investigation and Decision of Title IX Coordinator

84.     Jane Roe's allegations were subsequently investigated for potential violations of the University's Sexual Assault and Sexual Harassment Policy, Policy 418.1.

15

85.     The required Notice provided by the Title IX Coordinator to John Doe on

November 6, 2017, stated the following allegation:

> [Jane Roe] has alleged that on or about Sunday, October 29, 2017,
> that you engaged in behavior that may be in violation of the
> University's Sexual Assault and Sexual Harassment Policy and the
> prohibition against sexual assault.   Specifically [Jane Roe] has
> alleged that she believes sexual contact occurred while she was
> incapacitated and unable to give consent.  [Jane Roe] has stated that
> she went to your residence in the early morning of October 29, 2017,
> and has little recollection of what occurred.  However [Jane Roe] has
> articulated that she believes you had sexual contact with her when
> she was too intoxicated to give verbal or implied consent.

86.     At the outset of the investigation, John Doe requested that all interviews be

recorded, but that request was denied.

87.     Jane Roe was interviewed by Title IX Investigator Kristin Barnett regarding

her claim on either November 29 or November 30.[3]  Barnett's written summary of Jane

Roe's initial interview substantively tracks the allegations provided in the notice.

Specifically, Jane Roe told Barnett that she had been drinking earlier in the evening and

then met up with John Doe at his residence.  She stated that she did not recall much of the

evening at John Doe's house, but she did believe sexual intercourse had occurred because

she was not wearing underwear in the hospital, and her underwear were later retrieved

from John Doe's house.

88.     Jane Roe's initial statement contains no allegations that the alleged sexual

intercourse was through the use of force, threat, or intimidation.

---

[3] The Memorandum Barnett prepared regarding the interview indicates it was prepared on November 29, 2017;
however, the text of the memorandum states that the interview occurred the following day, on November 30, 2017.

89.     Jane Roe had the opportunity to review the summary and suggest revisions. She emailed Barnett with revisions on December 6, 2017, including a "really blurry" flashback wherein she describes a "memory" of having sexual intercourse with John Doe. Notably, despite describing this new recollection of intercourse, Jane Roe still made no allegation that the intercourse was without consent or through the use of force, threat or intimidation.

90.     On January 11, 2018, Jane Roe had a follow-up interview with Barnett to address questions submitted by John Doe. During the interview, Barnett asked Jane Roe if she recalled any instances during the encounter of getting "very angry and yelling about [John Doe] leaving to help a friend" or "threatening" [John Doe] if he refused to let her stay at his home.  Jane Roe responded that she "[could] not answer these questions because she has limited recollection of the evening."  As with the previous interviews, neither the interview summary nor Jane Roe's suggested revisions of the interview summary allege the use of force, intimidation or threat.

91.     In line with Jane Roe's statements, on December 14, 2017, the University confirmed to John Doe that that the allegations against him were only based on incapacitation and there were no allegations of any sexual contact by force.

92.     The Final Investigative Report, which included the Investigation Summary and additional materials submitted by both parties, was provided to John Doe on February 19, 2018.

93.     John Doe and his advisor had a Pre-Determination Meeting in accordance with Policy 418.1, with Title IX Coordinator Tyler Farrar in his office on February 26, 2018.

94.     During the meeting, John Doe declined to make a statement regarding the allegations, and asked for confirmation from Farrar that his silence would not be held against him.  Farrar confirmed that he would not interpret John Doe's silence negatively, but stated that "it would be different if Kristin [Barnett] was making the decision."

95.     Additionally, John Doe noted that the summaries of Jane Roe's statements as prepared by Barnett indicated frequent changes or modifications to Jane Roe's "recollections" of the evening's events.  John Doe asked Farrar if Jane Roe would be permitted to continue to change her story in the event of an appeal of a no-violation finding.

96.     Farrar responded that such a tactic would be "crazy" and that there was no way the Hearing Panel would find her credible in that case.

97.     Jane Roe and her advisor participated in a Pre-Determination Meeting on February 15, 2018.

98.     Upon information and belief, Jane Roe did not alter or amend her allegations at this meeting.

99.     After the initial investigation was completed, Farrar received the report from the investigation of the Fayetteville Police Department.

100.    The report noted that as part of their investigation, the Fayetteville Police had contacted the Uber driver who transported Jane Roe to John Doe's house on the night

18

in question.   According to the police report, the Uber driver stated she did not recall anything unusual about the ride or that Jane Roe seemed intoxicated.

101.   The police report also included a case summary from the primary officer, Officer Stacy Dicus.   The summary stated, "During the interview, [Jane Roe] told me on several occasions how to run my investigation.   She told her who I could talk to and told me she did not want me talking to several of her friends.   I have been unable to get into contact with [Jane Roe] since our conversation on November 9, 2017."

102.   The summary also stated, "On February 21, 2018, The University of Arkansas Title IX Coordinator responded to a subpoena for their investigation regarding this case.   The information was taken and added to the case file.   The investigation with Title IX showed several inconsistencies that were not mentioned or were contrary to [Jane Roe]'s original statement."

103.   Jane Roe's original statement to the Fayetteville police department was recorded and provided to the University.

104.   After receiving the report, Farrar gave both parties the opportunity to review it and make an additional statement regarding the contents of that information.

105.   On March 15, 2018, Farrar issued his Letter of Decision as the Title IX Coordinator.

106.   The University uses a preponderance of the evidence standard when reviewing alleged violations of the Policy.   In order to find John Doe in violation of Policy 418.1, evidence must have indicated that it is "more likely than not" that the infraction occurred.

107.    Based on the circumstantial evidence presented, Farrar determined that it was more likely than not that some form of sexual contact occurred between John Doe and Jane Roe.

108.    Farrar further found that although there was evidence to indicate that Jane Roe may have been intoxicated, the evidence was insufficient to establish that it was more likely than not that Jane Roe was intoxicated to the point of incapacitation.

109.    Based on the evidence, Farrar specifically held that the alcohol Jane Roe allegedly consumed had not substantially impacted her decision-making capacity, awareness of consequences, and ability to make fully informed judgments. On this point, he noted that Jane Roe indicated a clear ability to communicate with John Doe via text message and coordinate her efforts to leave the party so that she arrived at his residence shortly after he arrived.  Additionally, while she was in route to John Doe's house, Jane Roe was cognizant of her physical location and even narrated her location to John Doe through text messages by stating "turning on gregg" and using the correct spelling with two "g"s.

110.    Accordingly, Farrar found that the evidence established that Jane Roe was able to send many coherent, error-free, and goal-oriented text messages to John Doe on her way to his residence.  Farrar concluded that this suggested that Jane Roe was capable of making fully informed judgments regarding her actions.  Further, Farrar concluded that there was no evidence to suggest that Jane Roe drank more alcohol at John Doe's residence or consumed a significant amount of alcohol just prior to getting into the Uber.

In light of these facts, Farrar found that there was no evidence that Jane Roe was incapacitated when she was at John Doe's residence.

111.    Furthermore, Farrar found that there was no evidence to suggest that John Doe had reason to know of any alleged incapacitation.  To the contrary, Farrar found that "the text messages [John Doe] received from the Complainant on the night and morning in question would have led a reasonable person to the conclusion that the Complainant had the ability to understand the 'who, what, when, where, and how'" of her actions.

112.    Based on the above, Farrar found that John Doe did not sexually assault Jane Roe.

### F.  Hearing Panel Appeal

113.    Jane Roe submitted an appeal within five business days of the receipt of Farrar's Letter of Decision finding that John Doe did not sexually assault Jane Roe.

114.    In her appeal, Jane Roe challenged Farrar's findings that she was not incapacitated.  She also argued that Farrar made an assumption that she had consented to sexual contact from John Doe and that his decision lacked any analysis regarding whether she had, in fact, consented.

115.    Specifically, Jane Roe stated, "It is to my understanding that the University defines sexual assault allegations within two categories:  by force and through incapacitation.  I do not believe these terms are mutually exclusive.  I have stated this previously.  If an individual is incapacitated while someone performs sexual acts to them, those acts are subsequently "by force" without question."

116.    After receiving Jane Roe's appeal document but prior to the hearing before the Hearing Panel, John Doe requested clarification on the scope of the charges against him.   Specifically, John Doe noted that although the Title IX investigator (Barnett) had recently confirmed that the University was not pursuing allegations of use of force against John Doe, Jane Roe's statements in her appeal were confusing on the issue of force and "at this point, it is unclear whether the allegation is force or not.   Respondent is entitled to know specifically what he is defending."

117.    In response, Farrar, stated that John Doe would not know the full extent what charges the University would or would not pursue until he arrived at the hearing.

118.    Additionally, despite the University acknowledging that Jane Roe would present new "evidence" to the Hearing Panel, Farrar indicated that John Doe would not be provided any advance notice of information or evidence on which the University Hearing Panel would base its decision. The Title IX Coordinator declined to address John Doe's concerns and only summarily stated to John Doe, "New and additional material may be submitted to the hearing panel.   Historically, this has been achieved by bringing it to the hearing and providing copies to the panel members."

119.    John Doe requested that the Investigator, Kristin Barnett, appear at the Hearing Panel to allow John Doe to ask questions regarding the investigation.

120.    This request was denied and Barnett did not appear at the hearing.

121.    The Title IX Hearing Panel conducted a de novo hearing on Jane Roe's appeal of Farrar's findings on April 23, 2018.

122.   The Panel was comprised of three members: Jon Comstock, the Panel Chairman, Eric Specking, and Dina Wood.  The University represented to John Doe that the Panel members were knowledgeable and trained on proper adjudication of Title IX issues.

123.   At the outset of the hearing, John Doe requested a continuance of the hearing because the Title IX investigator (Barnett) was not present for the hearing and also because Jane Roe intended to introduce evidence that John Doe had never seen.

124.   The Panel denied the request.

125.   During the hearing, Jane Roe was, in fact, permitted to introduce new evidence that had not been previously provided or disclosed to John Doe, despite his numerous requests to the University for the opportunity to know if any new evidence was going to be presented.

126.   Rather than simply reviewing the findings made by the Title IX coordinator, the Panel instead conducted an entirely new hearing of the case.

127.   In reaching its final conclusion, the Panel found that "at some undetermined point in time, while [Jane Roe] was at [John Doe's] residence, she became incapacitated as defined by University policy."

128.   The Panel decision specifically held that it could not determine when the alleged incapacitation occurred:  "The Panel finds that at some *undetermined point in time*, while [Jane Roe] was at your residence, she became incapacitated as defined by University policy."  (emphasis added)

23

129.   The Panel did not rule on whether the incapacitation occurred before or after the sexual conduct.

130.   The Panel then expressly found that John Doe did not know or have reason to know of Jane Roe's incapacitation: "Given the uncertainty of the happenings of the evening, the Panel does not find that it is more likely than not that you knew or had reason to know of the period of time during which [Jane Roe] was or became incapacitated."

131.   Despite its finding that John Doe did not know or have reason to know of Jane Roe's alleged incapacitation, the Panel found by a vote of 2 to 1 that the evidence established that it was more likely than not that John Doe violated Policy 418.1. Specifically, the Panel generated, *sua sponte*, allegations that the sexual contact had occurred without consent, despite the fact that use of force had never been alleged, had been expressly ruled out by the Title IX Investigator, and had not been made known to John Doe at any point before the hearing.

132.   John Doe stated that the sexual contact was consensual.  Jane Roe stated that she did not recall whether she had consented or not.  There was no evidence in the record suggesting that the sexual contact was nonconsensual.

133.   Despite the record, the Panel decided to completely disregard the testimony of John Doe on four basis:  (1) in John Doe's statement and through questions John Doe "did not admit or acknowledge her level of intoxication upon arrival at [his] residence"; (2) John Doe "had motivation to skew the truth"; (3) John Doe's demeanor "lacked

24

"lacked credibility"; and (4) John Doe's lacked credibility since the Panel found John Doe's witness statements "internally inconsistent or irrelevant on the subject of consent."

134.   The Panel stated, "Because the record does not support a finding of consent by the Complainant, the Panel finds that you are 'responsible' for sexual assault in violation of Policy 418.1."

135.   In other words, in spite of John Doe's clear testimony that Jane Roe consented to the sexual activity, and with no evidence to the contrary, the Panel still found that there was insufficient evidence of consent.

136.   The finding by the Panel represents a clear shifting of the burden from the Complainant/University to establish a *lack of consent* to John Doe to establish the *presence of consent.*

### G. Publicity and OCR Investigation

137.   Unknown to John Doe at the time of the investigation, the University was being investigated by the Office of Civil Rights for failing to properly investigate Title IX allegations concerning on-campus sexual behavior.

138.   The University has a history of being criticized and subjected to public scrutiny regarding its handling of Title IX investigations.

139.   Prior to allegation being made against John Doe, various media outlets and students organizations reported that the University was not adequately resolving cases involving alleged sexual assault of female students against male students.

140.   Prior to and during the investigation of the allegations against John Doe, the Office of Civil Rights investigated allegations that the University's prior Title IX

investigations demonstrated a pattern and practice of improperly investigating Title IX cases.

141.    Additionally, a highly publicized lawsuit had recently been filed against the University, alleging that the University failed to properly adjudicate a Title IX complaint by a female athlete against a male athlete.

142.    Furthermore, during the pendency of the investigation against John Doe, the Arkansas legislature began an investigation into claims that the University was failing to properly investigate and adjudicate claims of sexual assault by females against males on the Fayetteville campus.[4]

143.    The investigations by the Office of Civil Rights, the lawsuit, and the legislature investigation resulted in numerous news articles being published criticizing the University's handling of sexual assault claims by females on the University of Arkansas – Fayetteville campus.

144.    Then, after the initial decision by the Title IX Coordinator (Farrar) finding John Doe committed no misconduct, Jane Roe also began to publicly criticize the University's decision to multiple media outlets and began a widely-followed on-campus protest about the University's decision.

145.    As part of Jane Roe's media blitz, John Doe was contacted by the campus newspaper, the Arkansas Traveler, for comment on his experience with the *confidential* Title IX process.

---

[4] https://www.kark.com/news/local-news/state-lawmakers-study-sexual-assault-on-u-of-a-campus/924536322

146.   Jane Roe's media blitz garnered mass, widespread attention prompting the University to issue a public statement.

147.   With Jane Roe's media blitz well-publicized, the University had serious motivation to reverse the Title IX coordinator's finding of no violation.

148.   The University, including but not limited to the University's Title IX office, was under pressure and fearful of sanctions from the Office of Civil Rights' investigation during this time and took steps harmful to John Doe to alleviate and lessen the scrutiny it was attracting from Jane Roe's media blitz and protests.

149.   The University and its Title IX office were fearful of a lawsuit from Jane Roe after her media blitz and campus-wide campaign.

150.   It was against this backdrop that Panel heard Jane Roe's appeal.

151.   Accordingly, due to this pressure by Jane Roe, the mounting investigation by Office of Civil Rights, and the ongoing federal lawsuit, the University's resolution of Jane Roe's appeal was tainted by bias and gender discrimination.

### H. Sanctions

152.   Historically, a University finding of sexual assault by force has resulted in the expulsion of the perpetrating student.

153.   In this case, the Panel, as a result of the "extremely close factual determinations that were very difficult to make," imposed the limited sanctions of requiring John Doe to complete Title IX training, ten hours of community service and an online sexual violence accountability course. John Doe was placed on conduct probation pending the completion of the sanctions.

27

154.   Based upon information and belief, the Hearing Panel's imposition of a "light" sentence on John Doe was because it recognized that the evidence did not support a finding against John Doe and its erroneous finding was influenced by a general bias against males arising from the media attention Jane Roe created, the legislative investigation, the ongoing investigation of the University by the Office of Civil Rights, and lawsuit alleging failure to adequately adjudicate Title IX allegations by females, and the threat of a lawsuit with its accompanying media attention by Jane Roe.

## CAUSES OF ACTION

### I.    42 U.S.C. 1983: Denial of Fourteenth Amendment Due Process Against All Defendants

155.   John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

156.   The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

157.   Fourteenth Amendment due process protections are required in higher education disciplinary proceedings.

158.   A person has a protected liberty interest in his good name, reputation, honor and integrity, which he cannot be deprived without due process.

159.   As a public institution, when the University and its representatives investigated and adjudicated the complaints made by Jane Roe against John Doe, the

University and its representatives were required to honor the rights and guarantees set forth in the Fourteenth Amendment of the United States Constitution.

160. The University's obligations, as carried out by its employees and representatives, are explicitly set forth in the University's contract with John Doe. Specifically, as a condition of his matriculation at University of Arkansas, John Doe agreed in writing to be bound by the rules and regulations contained in the University contract.

161. The University's obligations are set forth in the University's policies as established and adopted by the Board of Trustees, implemented by the University and its Title IX office, including the Title IX coordinator, Title IX investigators and Title IX Hearing Panel.

162. John Doe was entitled to process commensurate with the seriousness of the allegations and the potential discipline, sanctions, and repercussions he was facing. The allegations made against him could have resulted in the harshest sanctions available at the University, including expulsion, and, regardless of any sanction levied, have lifelong ramifications for John Doe.

163. Accordingly, John Doe was entitled to fundamentally fair procedures to determine whether he was responsible for the alleged sexual misconduct.

164. John Doe has a protected economic and property interest in the $125 he paid out-of-pocket for the sexual assault training class, of which he cannot be deprived without due process.

165.   John Doe has a protected liberty interest in his good name, reputation, honor, and integrity, of which he cannot be deprived without due process.

166.   John Doe has a protected liberty interest in pursuing his education, as well as future educational and employment opportunities and occupational liberty, of which he cannot be deprived without due process.

167.   John Doe was disciplined and sanctioned by the University, depriving him of his property and liberty interests, without being afforded basic due process, including, but not limited to, notice of and a fair procedural hearing.

168.   John Doe was not allowed notice of the charges against him until the hearing.

169.   Specifically, although John Doe received an initial notice of allegations made by Jane Roe, the Title IX Coordinator, Investigator and Hearing Panel allowed Jane Roe to change her allegations throughout the proceeding without providing notice to John Doe.

170.   The Sexual Assault policy makes clear that sexual assault occurs in two circumstances:  (1) when the alleged victim has not consented and the sexual acts are committed "either by force, threat, or intimidation;" or (2) when the alleged victim is unable to consent and the sexual act occurs "through the use of the victim's mental or physical helplessness, of which the assailant was aware or should have been aware."

171.   Jane Roe's initial allegations against John Doe, as memorialized in the notice provided by the Title IX Office were as follows:

30

> Jane Roe has alleged that on or about Sunday October 29, 2017, that
> you engaged in behavior that may be in violation of the University's
> Sexual Assault and Sexual Harassment Policy and the prohibition
> against sexual assault.  Specifically, [Jane Roe] has alleged that she
> believes sexual contact occurred while she was incapacitated and
> unable to give consent.  [Jane Roe] has stated that she went to your
> residence in the early morning of October 29, 2017, and has little
> recollection of what occurred.  However, [Jane Roe] has articulated
> that she believes you had sexual contact with her when she was too
> intoxicated to give verbal or implied consent.

172.    Notably, the notice alleges only that the sexual conduct occurred while Jane

Roe was incapacitated (i.e.: the second situation contemplated in the University Sexual

Assault policy) and does not make any claims regarding sexual activity through the use of

force, threat, or intimidation.

173.    Additionally, the Title IX Investigator expressly assured John Doe that Jane

Roe was not raising an allegation of sexual contact without consent but rather, "Her

allegations are that she was incapacitated, therefore incapable of giving consent."

174.    Accordingly, the Hearing Panel's determination that John Doe violated the

Sexual Assault policy by engaging in sexual conduct without consent was made without

notice to John Doe.

175.    The University's appeal process violated the notice requirement further by

allowing Jane Roe to introduce new or additional evidence, without requiring any notice

to be given to John Doe.  The University's actions forced John Doe to attend the appeal

hearing without any prior knowledge of what he was actually being accused of, as well as

not knowing what evidence would be presented against him.

176.   John Doe's due process rights were also violated by the failure of the University to allow him or his representative to cross-examine his accuser.

177.   Cross-examination of the accuser is required to protect a defendant's basic due process rights in campus disciplinary cases.

178.   Here, neither John Doe nor his representative was permitted to question his accuser or other relevant witnesses because of the University's use of the "single-investigator" model for development of its Final Investigative Report.  Under this model, the accused student is not permitted to hear the statements of the complainant or other witnesses, ask questions, or respond to those statements until after the investigative report is compiled by the investigator.

179.   Furthermore, in the appeal hearing, neither John Doe nor his representative were permitted to question Jane Roe.  John Doe was only permitted to submit questions to his accuser through the University's Title IX office and Hearing Panel.   The University's Title IX office and Hearing Panel had sole discretion to ask questions requested by John Doe.  John Doe was not permitted to cross-examine his accuser or question her under oath, in violation of due process of law.

180.   The Hearing Panel did not pose questions as they were asked by John Doe, or ask pertinent follow up questions after Jane Roe's answers.   Instead, the Panel frequently paraphrased questions or left out important points from the questions John Doe requested, further frustrating his ability to confront his accuser or establish her lack of credibility.

181.    The University also failed to investigate or credit exculpatory evidence identified by John Doe.

182.    Specifically, the University failed to interview numerous witnesses suggested by John Doe, including Jane Roe's mother or her ex-boyfriend, who both communicated with Jane Roe contemporaneous to the incident.

183.    Defendants also violated John Doe's substantive due process rights by imposing a decision against him that was an arbitrary abuse of executive power. Specifically, Defendants disregarded substantial evidence contradicting Jane Roe's allegations, including the testimony of Officer Stacy Dicus, the Fayetteville Police Department office who investigated the incident and testified that Jane Roe was not credible.

184.    The finding of the Hearing Panel that Jane Roe's allegations were credible was arbitrary and unsupported, given the fact that she changed her story multiple times and made numerous internally inconsistent claims throughout the process.

185.    The Hearing Panel's decision was also arbitrary in that the Panel relied on partial and incomplete records and evidence without requiring her to produce the entire record or allow John Doe to examine it.

186.    The University improperly considered "junk science" arguments regarding the actions of trauma victims in order to justify and rely on Jane Roe's ever-changing narrative of the events of October 29, 2017.

187.    The University also violated John Doe's due process rights by conducting an entirely new hearing based on new allegations that the Hearing Panel raised *sua sponte*

following the University's acquittal of John Doe in the initial finding, solely on the basis that the University (Jane Roe) failed to meet its burden of proof during the first proceeding.

188.   As the Department of Education has recently confirmed, allowing a complainant to bring a *de novo* appeal against the respondent following a finding of no violation is not required by Title IX, the Clery Act, or other federal law.  Furthermore, the respondent "should not be made to be tried twice for the same allegation."  Office for Civil Rights, U.S. Dep't of Educ., Dear Colleague Letter on Campus Sexual Misconduct (2017), available at https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf.

189.   The appeal process was inherently unfair since the Hearing Panel improperly shifted the burden to John Doe to prove that there was consent, rather than requiring the University to show that the preponderance of the evidence established that the sexual activity was without consent. This result was predetermined by the University as a way to protect the University from the continued scrutiny regarding its treatment of sexual harassment cases and Jane Roe's continued attacks and negative publicity.

190.   The Hearing Panel's failure to follow the directions of the Policy illustrates a clear and improper failure of training.

191.   Furthermore, Defendants violated John Doe's due process rights by using the "preponderance of the evidence" standard rather than a higher burden more appropriate for the quasi-criminal nature of the sexual assault proceedings.

34

192.    Additionally, the Hearing Panel was not a neutral arbitrator, but instead was acting in concert and influenced by the University.  Specifically, the Hearing Panel was advised throughout the hearing by in-house counsel for the University who permitted the Hearing Panel to take actions in violation of due process.

193.    The investigation and adjudication implemented, overseen and carried out by Defendants flagrantly violated John Doe's clearly established rights under Section 1983 and the Due Process Clause of the Fourteenth Amendment through its repeated acts of gender bias and deprivation of the minimal requirements of procedural fairness.

194.    The policies of the Board of Trustees and University, as well as their implementation by the named University employees deprived John Doe of his liberty and property interests without affording him basic substantive or procedural due process, including, but not limited to: his right to fair adjudication; his right to be informed of the exact charges against him; his right to be heard by an impartial fact finder; his right to question his accuser; his right to challenge the credibility of any adverse witnesses; and his right to present evidence and witnesses in support of his defense.

195.    In the course of such investigation and adjudication, Defendants flagrantly violated John Doe's clearly established rights under the Section 1983 and the Due Process Clause of the Fourteenth Amendment through their deprivation of the minimal requirements of procedural fairness by employing a process in which there is limited and inadequate cross-examination, improper sworn testimony, consideration of partial, incomplete and out of context evidence, allegations are repeatedly changed without notice to the accused, a respondent has no adequate ability to defend himself, there is no

35

presumption of innocence but rather a presumption that the female's accusations are true, there is no reasoned consideration of evidence as required by a burden of proof, no requirement for evidence to be stated in support of conclusions and thus an effective discretion to engage in arbitrary and discriminatory decision-making.

196.   As a result, Defendants failed to provide Plaintiff with the basic due process protections that they are required to provide to students accused of sexual misconduct, in violation of the Fourteenth Amendment and Section 1983.

197.   As a result of these due process violations, John Doe suffers ongoing harm, including to his reputation and economic value, including damages to his reputation and other non-economic and economic damages.

198.   Accordingly, Defendants are liable to Plaintiff for violations Section 1983 and the Due Process Clause of the Fourteenth Amendment, and for all damages arising therefrom.

199.   As a direct and proximate result of the above conduct, Plaintiff John Doe sustained damages, including, without limitation, emotional distress, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

200.   John Doe is hoping to attend graduate school in the future.  Due to the University's due process violation, his chances will be adversely affected since he will have to disclose the Hearing Panel's finding on any future academic application.

201.   Additionally, in response to a request for a recommendation, John Doe has been informed by his University professors that they would be required to disclose in

their recommendation their knowledge of the sexual assault finding and that such disclosure would have negative impacts on John Doe's likelihood of acceptance to graduate school.

202.   Since monetary value and his reputation are constitutionally protected interests under due process, John Doe is entitled to prospective injunctive relief including a rescission or reversal of the Hearing Panel's finding of violation, expungement of his disciplinary records, a written reversal of the Hearing Panel's decision, removal of any reference to the sanction from his educational file, and destruction of any and all records pertaining to the investigation.

203.   In addition to injunctive relief, Plaintiff John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## II.   Violation of Title IX of the Education Amendments of 1972 Against All Defendants (Erroneous Decision)

204.   John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

205.   Title IX of the Education Amendments of 1972 provides, in relevant part, that:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

37

206.    Title IX of the Education Amendments of 1972 applies to an entire school or institution if any part of that school receives federal funds.

207.    Sovereign and Eleventh Amendment immunity do not apply to claims arising under Title IX.

208.    Title IX may be violated by a school's failure to prevent or remedy sexual harassment or sexual assault or by the imposition of university discipline where gender is a motivating factor in the decision to discipline. In either case, the statute is enforceable through an implied private right of action.

209.    According to statistics on campus sexual assault, sexual violence disproportionately affects college women.

210.    Title IX requires a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student . . . complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice) (emphasis added). Such prohibited actions include all forms of sexual harassment, including sexual intercourse, sexual assault, and rape.

211.    The procedures adopted by a school covered by Title IX must not only "ensure the Title IX rights of the complainant," but must also "accord due process to both parties involved."

212.    The "prompt and equitable" procedures that a school must implement to "accord due process to both parties involved" must include, at a minimum:

38

1.    "Notice . . . of the procedure, including where complaints may be filed";

2.    "Application of the procedure to complaints alleging [sexual] harassment . . .";

3.    "Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence";

4.    "Designated and reasonably prompt timeframes for the major stages of the complaint process"; and

5.    "Notice to the parties of the outcome of the complaint"

213.    A school also has an obligation under Title IX to make sure that all employees involved in the conduct of the procedures have "adequate training as to what conduct constitutes sexual harassment, which includes "alleged sexual assaults."

214.    Challenges to university disciplinary proceedings for sex discrimination generally fall into two categories: (1) "erroneous outcome" cases, in which the claim is that plaintiff was innocent and wrongly found to have committed an offense and gender bias was a motivating factor behind the erroneous findings; and (2) "severity of penalty/selective initiation" cases, in which the claim generally asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or decision to initiate the proceeding was affected by the student's gender.

215.    An "erroneous outcome" occurred in this case because John Doe was innocent and wrongly found to have committed sexual assault, and gender bias was a motivating factor.

216.    The denial of due process, misapplication of the burden of proof, and

procedural errors made in this case resulted in an "erroneous outcome" based on a flawed and distorted conception of the facts and a perceived need to protect the University of Arkansas from further scrutiny for failing to protect female victims of sexual assault.

217.   Defendants failed to conduct an adequate, reliable, and impartial investigation when it conducted its investigation and hearing on Jane Roe's allegations.

218.   The subsequent investigation and adjudication were further conducted in a manner that was biased against John Doe, depriving him of adequate notice and material information necessary to meaningfully participate in the adjudication process.

219.   The investigators and adjudicator were further biased by the University's erroneous conclusion that John Doe had engaged in misconduct and were further motivated by the intense negative media attention and Office of Civil Rights investigation occurring simultaneously with the investigation and hearing of Jane Roe's allegations.

220.   The Defendants' decisions regarding the investigation and hearing into Jane Roe's allegations were not based on the evidence or witness testimony, but were motivated by a presumption that Jane Roe, as a female, was more credible than John Doe, a male.   Furthermore, the Defendants sought to avoid any further negative media attention against the University that Jane Roe might create.

221.   In its stated reasoning for not finding John Doe's testimony on consent "persuasive," the Panel exhibited several instances of gender bias or clear error:

     a.   "in your statement and through questions you did not admit or acknowledge her level of intoxication upon arrival at your residence"

        i.   This statement illustrates the Panel's assumption that males should

be able to assess the intoxication level of females at all times, even without having any knowledge of what alcohol the female may have consumed, and considering that multiple other witnesses indicated that her intoxication level was not evident.

    ii.   Furthermore, this statement contradicts the Panel's earlier finding that John Doe did not know or have reason to know of Jane Roe's alleged incapacitation, or intoxication for that matter.

b.  "you have motivation to skew the truth"

    i.   This statement illustrates the Panel's assumption that Doe, as a male, would have motivation to "skew the truth" in contrast with female, Jane Roe, whose allegations they took without question, which disregarded her ever-changing narrative that relied on junk science.

    ii.   Here, Jane Roe had a high motivation to skew the truth in *her* favor which the Panel completely disregarded, or did not consider. She had already engaged in and led a campus-wide campaign against sexual violence which would have been undermined if it were determined she was "skewing the truth."

c.  "the lack of corroboration in your statement since we found your witnesses' statements internally inconsistent or irrelevant on the *subject of consent*" (emphasis added)

    i.   The *subject of consent*, by the Panel's own admission ("whether consent is found to be present (before the period of [alleged]

incapacitation set in) depends on the Panel's credibility determination of [John Doe]'s testimony"), was solely based on John Doe's testimony so it was clear error to hold the "lack of corroboration" on the *subject of consent* from other witnesses against him. By all accounts, John Doe and Jane Roe were the only possible witnesses that could have provided testimony regarding the *subject of consent*.

ii. Furthermore, the Panel credited Jane Roe's statement regarding consent, that she did not recall whether she had consented but she did not know why she would have, despite the fact that she did not have corroboration on this point. This is clear evidence of gender bias, as the Panel held John Doe, the male, to a higher (and improper) burden of proof than the female, Jane Roe.

222. As stated above, cross-examination has been recognized as the greatest legal engine ever invented for discovery of the truth, *Lilly v. Virginia*, 527 U.S. 116, 124 (1999), and has been ruled to be required for basic due process in campus disciplinary cases, *Donohue v. Baker*, 976 F. Supp. 136 (N.D.N.Y. 1997).

223. Yet, John Doe's proposed questions for Jane Roe and certain witnesses were limited and required approval by Defendants Comstock, Specking and Wood, and many of John Doe's cross-examination questions were excluded from the Hearing, in violation of due process of law. *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 404 (6th Cir. 2017); *see also Doe v. Baum*, Case No. 2:16-cv-13174, 2018 WL 4265634 (6th Cir.

2018) (decision decided September 7, 2018, finding that failure to allow respondent to cross-examine claimant violated student's due process rights).

224.   The method of "cross-examination" employed by Defendants did not allow John Doe or his representative to attack Jane Roe's credibility, as was critical in a case where the ultimate determination turned solely on the credibility of the witnesses. *Doe v. Baum*, No. 17-2213, 2018 WL 4265634 (6th Cir. Sept. 7, 2018).

225.   The totality of the circumstances establishes that Defendants acted out of gender bias in reaching the "erroneous outcome." Defendants did not weigh the evidence in John Doe's favor, or lack of evidence to support Jane Roe's allegations, when reaching their decision.

226.   The Hearing Panel's decision represents a clear failure of training on the University policies and edicts of Title IX.

227.   Furthermore, the Sanction imposed on John Doe was arbitrarily imposed, without explanation or rationale, seemingly to avoid any further negative media attention and present to the public a stricter approach to any situation wherein sexual assault allegations are involved.

228.   Furthermore, the sanctions were arbitrary in light of the Panel's findings that John Doe sexually assaulted Jane Roe.   Upon finding a student guilty of sexual assault, the University typically imposes suspension or expulsion. John Doe's unusually light sanction is further proof that the Panel's decision is arbitrary.

229.   Here the evidence substantially favored John Doe's version of the events and greatly contradicted Jane Roe's allegations, but Defendants formed a conclusion

against John Doe supporting John Doe's contention that Defendants were primarily motivated by bias in discharging their responsibilities to fairly investigate and adjudicate the dispute.

230.   First, in reviewing John Doe's matter, the Hearing Panel arbitrarily reversed the decision by Farrar and found that Jane Roe became incapacitated while she was at John Doe's residence, as defined by University policy.

231.   The primary evidence cited by the Hearing Panel in support of this finding was Jane Roe's statement that she was unable to recall the details of the evening.

232.   In light of the substantial evidence to the contrary, as cited in the opinion of Farrar, this finding by the Hearing Panel was not supported by a preponderance of the evidence and was rendered in violation of University policy.

233.   Furthermore, the Hearing Panel expressly found that John Doe did not know or have reason to know of Jane Roe's incapacitation, stating "[g]iven the uncertainty of the happenings of the evening, the Panel does not find that it is more likely than not that you knew or had reason to know of the period of time during which the Complainant was or became incapacitated."  Given the finding that John Doe did not know or have reason to know of Jane Roe's incapacitation, the requirements for a finding of sexual assault based upon incapacitation were not met.

234.   After affirming the underlying ruling that John Doe could not have been aware of Jane Roe's alleged incapacitation, the Hearing Panel adjudicated Jane Roe's new allegation of forceful sexual assault despite failing to provide notice of these new allegations to John Doe.

235.   Compounding that error, the Hearing Panel improperly shifted the burden of proof to John Doe regarding proof of consent.  Specifically, the Hearing Panel stated, "[t]he record on the part of the Complainant is absent of any evidence of consent."  The Hearing Panel also stated that, although John Doe had stated that Jane Roe gave express verbal consent, and Jane Roe had not refuted this statement but simply stated that she had no recollection of it, they did not credit John Doe's statement.  The Hearing Panel concluded that "because the record does not support a finding of consent by the Complainant, the panel finds that you are responsible for sexual assault in violation of Policy 418.1."

236.   The Hearing Panel's decision reflects a fundamental misunderstanding and failure of training on the issue of the burden of proof in Title IX cases involving sexual assault.  This improper burden shifting of the Hearing Panel suggests that Defendants were biased against John Doe based on his gender and that the University and Title IX office failed to provide proper training or guidance to the Panel regarding the adjunction of Title IX claims.

237.   Upon information and belief, Defendants were pressured by on-campus protests, negative media attention, the ongoing investigation by the Office of Civil Rights, and Jane Roe's media blitz calling for the University to reverse its initial decision of no misconduct by John Doe. This result was predetermined by the University as a way to protect the University from the continued scrutiny regarding its treatment of claims of sexual assault by females against males, and specifically, Jane Roe's continued attacks and negative publicity claiming that the University disregarded her claim because she

45

was a female.

238.    During the period preceding the Hearing Panel Appeal, there was substantial criticism of the University and its Title IX office, both in the student body and the public media, accusing the University of not taking seriously complaints of sexual assault of female students by male students.

239.    The University's administration was cognizant of, and sensitive to these criticisms, particularly the criticisms made by Jane Roe, to the point that the University's decision makers and Title IX office became motivated to favor Jane Roe and undermine John Doe's due process rights, so as to protect themselves and the University from any further negative media attention and accusations that they had failed to protect female students from sexual assault.

240.    Stated otherwise, the University feared a lawsuit, and its associated media attention, from Jane Roe more than it feared this current lawsuit, and the associated media attention it will produce, from John Doe.

241.    The totality of circumstances establishes that Defendants have demonstrated a pattern of inherent and systematic gender bias and discrimination against male students accused of misconduct.

242.    In the time since the criticism and scrutiny of the University began, the University has found a violation in the overwhelming majority of cases where a female student alleges sexual assault by a male student.

243.    The majority of all previous male students that have been found guilty of committing sexual assault have been suspended or expelled.

46

244.   The fact that John Doe was found to have committed sexual assault by force, but only sanctioned to ten hours of community service demonstrates that the sanction imposed on John Doe was arbitrarily imposed, without explanation or rationale, in order to hopefully satisfy all parties involved and avoid any further negative media attention and present to the public a stricter approach to any situation wherein sexual assault allegations by a female are involved.

245.   As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, emotional distress, loss of educational, career opportunities, economic injuries and other direct and consequential damages.

246.   As a result of the foregoing, John Doe is entitled to damages and punitive damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and to an injunction enjoining violations of the Title IX in the process of investigating and adjudicating sexual misconduct complaints.

### III.   Violation of Title IX of the Education Amendments of 1972 and Section 1983 Against All Defendants (Deliberate Indifference of Defendants University of Arkansas, Farrar, Comstock, Specking, Wood, Barnett)

247.   John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

248.   Defendants University, Farrar, Comstock, Specking, Wood, and Barnett had actual notice of the irresponsible, improper and sexually-biased manner in which the allegations against John Doe were being investigated and adjudicated.

249.   Defendants University, Farrar, Comstock, Specking, Wood, and Barnett,

despite having authority to institute corrective measures to stop the misconduct, were deliberately indifferent to the misconduct against John Doe.

250.   Furthermore, upon information and belief, Defendants University, Farrar, Comstock, Specking, Wood, and Barnett maliciously perpetuated the anti-male bias against Plaintiff to protect the University's reputation and Title IX funding.

251.   These separate Defendants' deliberate indifference was motivated by John Doe's gender and their desire to avoid any further negative media attention and accusations that they had failed to protect female students from sexual assault, specifically Jane Roe.  In light of the University's history of mishandling sexual assault allegations, these separate Defendants sanctioned, tolerated, and endorsed procedures, policies and actions which effectively and intentionally deprived John Doe of his right to a fair hearing.

252.   As a direct result of these separate Defendants' deliberate indifference, John Doe sustained tremendous damages, including, without limitation, emotional distress, loss of educational, career opportunities, economic injuries and other direct and consequential damages.

### *JURY DEMAND*

253.   Plaintiff John Doe requests a trial by jury of all issues presented herein that are capable of being tried by a jury.

### *PRAYER FOR RELEIF*

**WHEREFORE,** for the foregoing reasons, John Doe demands judgment against Defendants as follows:

a. Judgment against Defendants awarding John Doe actual and compensatory damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements;

b. An injunction against continued due process violations in the University's investigation and adjudication of sexual misconduct complaints;

c. Injunctive relief requiring any and/or all Defendants to reverse, rescind and expunge all findings of sexual assault violations against John Doe;

d. An injunction against continued violations of Title IX in the University's investigation and adjudication of sexual misconduct complaints; and

e. An award to John Doe of such other and further relief as the Court deems just, equitable and proper.

WILLIAMS & ANDERSON PLC
111 Center Street, Suite 2200
Little Rock, Arkansas 72201
Telephone:  501 372 0800
Facsimile: 501 372 6453


By: _____
Heather Zachary (AR#2004216)
hzachary@williamsanderson.com
Alec Gaines (AR#2012277)
againes@williamsanderson.com

*Attorneys for John Doe*

49