UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

JOHN DOE                                                                    PLAINTIFF

v.                                      No. 5:18-CV-05182

UNIVERSITY OF ARKANSAS-
FAYETTEVILLE, et al.                                                        DEFENDANTS

## OPINION AND ORDER

Before the Court is Defendants' motion (Doc. 17) to dismiss and brief (Doc. 18) in support.

Plaintiff John Doe filed a response (Doc. 22). For the following reasons, Defendants' motion will

be GRANTED.

### I.       Background

John Doe and Jane Roe were students at the University of Arkansas-Fayetteville ("UA").

(Doc. 1, p. 7). The students exchanged messages over social media and hung out socially several

times during the Fall 2017 semester. *Id.* On October 28, 2017, Roe attended a Halloween-themed

party. *Id.* During the party, Roe began a text message conversation with Doe. (*Id.*, p. 8). After

exchanging several messages, the students decided to meet up at Doe's apartment. *Id.* Roe and

Doe engaged in sexual intercourse and then Doe took Roe home. (*Id.*, pp. 8-10). Following this

encounter, Roe filed a complaint with UA alleging that Doe sexually assaulted her in violation of

the University of Arkansas-Fayetteville Policy 418.1, because Roe was too incapacitated to engage

in a consensual sexual encounter. (*Id.*, pp. 15-16). Tyler Farrar, UA's Title IX Coordinator,

reviewed the complaint and determined that Doe was not responsible for a violation of UA's sexual

assault policy. (*Id.*, p. 21). Roe filed an appeal of Farrar's decision. *Id.* A three-member hearing

panel conducted a de novo review on April 23, 2018. (*Id.*, p. 22). The hearing panel found Doe

responsible for sexual assault in violation of the UA policy. (*Id.*, p. 25). UA required Doe to

complete Title IX training, ten hours of community service, and an online sexual violence accountability course.  (*Id.*, p. 27)  Doe filed the instant suit against UA, its Title IX coordinator and investigator, and the hearing panel members under 42 U.S.C. § 1983, alleging UA's sexual assault resolution process failed to afford him due process as required by the Fourteenth Amendment of the United States Constitution.  Doe also claims that he was subject to gender discrimination in violation of Title IX of the Education Amendments of 1972.

UA is a public university located in Fayetteville, Arkansas.  UA's sexual assault policy and grievance procedure is regulated by Title IX regulations promulgated by the United States Department of Education.[1]  In 2011, the United States Department of Education Office of Civil Rights issued a "Dear Colleague Letter"[2] providing guidance to universities on how to fulfill the requirement of adopting "prompt and equitable" sexual assault resolution procedures under Title IX.  U.S. DEP'T OF ED., OFFICE FOR CIVIL RIGHTS, DEAR COLLEAGUE LETTER (Apr. 4, 2011).  The guidance encouraged schools to establish a Title IX Coordinator position, adopt a preponderance of the evidence standard for adjudications, allow appeals for both parties, and to exclude cross-examination of the alleged victim by the accused, among other suggested procedures.  UA structured its procedures to comply with this guidance.  (Doc. 1, pp. 11-12).

---

[1] Because UA is a public university that receives federal funding, it must adhere to the requirements of Title IX of the Education Amendments of 1972.  *Roe v. St. Louis Univ.*, 746 F.3d 874, 881 (8th Cir. 2014).  The United States Supreme Court has held that a failure to appropriately resolve student-on-student sexual assault claims may be considered sex discrimination in violation of Title IX.  *Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60, 75 (1992).  The Department of Education regulations require schools subject to Title IX to "adopt and publish grievance procedures providing for prompt and equitable resolution of student . . . complaints alleging any action which is prohibited [by Title IX]."  34 C.F.R. § 106.8.

[2] A "Dear Colleague Letter" is a guidance document.  Guidance documents "do[] not add requirements to applicable law."  U.S. DEP'T OF ED., OFFICE FOR CIVIL RIGHTS, DEAR COLLEAGUE LETTER, 1 (Apr. 4, 2011).  Rather, the "Dear Colleague Letter" was intended to inform schools of how the Office of Civil Rights evaluates whether they are complying with their Title IX obligations.  *Id.*

### A.    UA's Sexual Assault Resolution Procedure

UA has a formal adjudicative process.  UNIVERSITY OF ARKANSAS-FAYETTEVILLE POLICIES AND PROCEDURES 418.1 (XIII) (2019).  Upon receiving a report of a potential Title IX student code violation, UA's Title IX Coordinator conducts an intake meeting with the complainant.  (*Id.*, 418.1(A)(1)).  This meeting is used to gather information from the complainant and for the Title IX Coordinator to determine whether accommodations or mental/physical health referrals are appropriate.  *Id.* If the complainant expresses a desire to file a complaint in the initial intake meeting, the Title IX Coordinator conducts an intake meeting with the respondent.  *Id.*  UA policy allows for the complainant and the respondent to be accompanied by an advisor/support person to assist during the process.  *Id.*  However, the advisor/support person is not allowed to speak for the parties during the proceedings.  *Id.*

After the Title IX Coordinator completes the intake process and the complainant opts to file a formal complaint, the Title IX Coordinator assesses whether a potential Title IX violation has occurred.  (*Id.*, 418.1(A)(2)).  If the Title IX Coordinator "determines that a potential Title IX violation occurred," he refers the matter to the Office of Student Standards and Conduct's Title IX Investigator to complete a "comprehensive investigation."  (*Id.*, 418.1(A)(3)).  At the conclusion of her investigation, the Title IX Investigator compiles a summary of the investigation and provides it to the Title IX Coordinator.  *Id.*  Once the summary of the investigation is complete, the Title IX Coordinator provides a copy of the summary to both parties.  (*Id.*, 418.1(A)(4)).  The parties are then allowed to submit additional relevant information to the Title IX Coordinator and may request a pre-decision meeting.  *Id.*  Once the parties have filed any additional submissions, the Title IX Coordinator compiles all material submitted into an investigative report.  *Id.*  If the Title IX Coordinator determines based on a preponderance of the evidence that the "conduct at issue

constitutes a violation of Title IX," the Coordinator determines the appropriate remedy or sanction as part of his written finding. *Id.* However, if the Title IX Coordinator finds that the conduct at issue does not constitute a violation of Title IX, the Title IX Coordinator determines and documents the appropriate resolution of the case and notifies the parties of that determination. *Id.*

Once the Title IX Coordinator has issued his determination to the parties, either party may file an appeal of any or all of the Title IX Coordinator's decision. (*Id.*, 418.1(A)(5)). The appeal is to be heard by a three-member hearing panel. *Id.* When a party appeals, the Title IX Coordinator and both parties are notified in writing of the appeal and the issues the appellant is challenging. *Id.* The appellee may file a response to the appeal within three days after receipt of appeal notice. *Id.*

Within three days of the appellant filing an appeal, the Assistant Director of the Office of Equal Opportunity and Compliance ("AD-OEOC") selects the members of the Title IX hearing panel. *Id.* The hearing panel consists of a mixed-gender panel of individuals who are members of UA's Title IX hearing board, Title IX Coordinators or Deputy Coordinators from other University of Arkansas System Campuses, or other specifically designated and trained members of the Northwest Arkansas legal community. *Id.* UA only allows individuals who have participated in in-person Title IX hearing panel training to serve on a hearing panel. *Id.* The parties may object to the individuals selected for their appeal hearing panel. *Id.*

The parties are permitted to submit witness lists for the hearing. *Id.* The AD-OEOC then provides notice to the parties and the witnesses listed requesting that the individuals appear before the hearing panel. *Id.* Both parties may present evidence, but formal rules of evidence do not apply during the proceeding. *Id.* The parties are not allowed to personally question or cross-examine one another. *Id.* However, the parties may question witnesses. *Id.* After the close of the

4

hearing, the hearing panel confers and votes to determine whether the evidence establishes that it is more likely than not that the Respondent committed a violation of the sexual assault policy. *Id.* If the hearing panel determines that a violation occurred, it assigns sanctions. *Id.* Appropriate sanctions are based on "the nature and gravity of the misconduct, and any record of prior student discipline . . . ." *Id.* The decision of the hearing panel is final. *Id.*

### B.      Doe's Disciplinary Proceedings

On October 28, 2017, Jane Roe attended a Halloween-themed party. (Doc. 1, p. 7). During the party Roe texted Doe, whom she had met during her time at UA. *Id.* At 11:31 p.m., Roe sent Doe a picture of herself in her Halloween costume holding a beer. (*Id.*, p. 8). Through a series of text messages, the two students decided to "hang out." *Id.* At 11:58 p.m., Doe informed Roe that he was taking an Uber back to his apartment and told Roe that he would be home by 12:15 a.m. *Id.* Roe then informed Doe that she would call an Uber to his apartment after one more song. *Id.* Roe asked for Doe's address so that she could enter it into her Uber request. *Id.* At 12:16 a.m., Roe texted Doe to inform him that she was on her way. *Id.* At 12:22 a.m., Roe arrived at Doe's apartment. *Id.* Doe alleges that Roe confirmed during the investigation that she was not drunk while she was texting him and did not drink anymore while at Doe's residence. *Id.* When she arrived, Roe suggested that the two go into Doe's room to talk. *Id.* Doe asserts that Roe turned off the lights and began kissing him. *Id.* Doe and Roe then engaged in sexual intercourse. (*Id.*, p. 9). Doe claims that Roe confirmed several times that she wanted to have sex with him. *Id.* After the encounter, Doe drove Roe home. (*Id.*, p. 10). On the drive home, Roe gave Doe directions to her apartment. *Id.* A few hours later, Roe's roommate's boyfriend found Roe in her room bleeding from self-inflicted wounds. (*Id.*, p. 11). The boyfriend called 911. *Id.* Doe alleges that Roe told the 911 operator that she was not intoxicated, and that she had cut herself in reaction

to a recent breakup.  *Id.*  Roe was taken to the hospital.  *Id.*  When Roe arrived at the hospital, she declined a rape kit.  *Id.*

On November 6, 2017, Doe received a notice of allegation from Tyler Farrar, UA's Title IX Coordinator, alleging that:

> [O]n or about Sunday, October 29, 2017, . . . [Doe] engaged in behavior that may be in violation of the University's Sexual Assault and Sexual Harassment Policy and the prohibition against sexual assault. Specifically [Jane Roe] has alleged that she believes sexual contact occurred while she was incapacitated and unable to give consent. [Jane Roe] has stated that she went to your residence in the early morning of October 29, 2017, and has little recollection of what occurred. However, [Jane Roe] has articulated that she believes you had sexual contact with her when she was too intoxicated to give verbal or implied consent.

(*Id.*, p. 16).  On November 30, 2017, Roe was interviewed by Kristen Barnett, UA's Title IX Investigator.  *Id.*  In that interview, Roe explained that she had been drinking earlier that evening and then met up with Doe at his residence.  *Id.*  She shared that she did not recall much of the evening at Doe's house but believed that the two had sexual relations because she was not wearing underwear when she arrived at the hospital that evening, and her underwear was found at Doe's apartment.  *Id.*  After the interview, Barnett allowed Roe to review the summary of the interview and suggest revisions.  (*Id.*, p. 17).  Roe suggested edits including a memory of having sexual intercourse with Doe.  *Id.*  After Barnett's initial interview with Roe, Barnett met with Roe again on January 11, 2018, to address two questions submitted to Barnett by Doe.  *Id.*  Roe responded that she could not answer the questions because "she had a limited recollection of the evening." *Id.*

Farrar, UA's Title IX Coordinator, provided the Final Investigative Report, including Barnett's investigation summary and additional materials submitted by both parties, to Doe and Roe on February 19, 2018.  *Id.*  Doe and his advisor requested a pre-determination meeting with Farrar.  (*Id.*, p. 18).  Farrar offered to allow Doe to make a statement regarding the allegations, but

Doe declined.  *Id.*  In the meeting, Doe asserted that Roe changed her story multiple times over the course of the investigation.  *Id.*  After the initial investigation was complete, Farrar received the Fayetteville Police Department's investigation report.  *Id.*  The report noted that Roe's Uber driver did not recall anything unusual about the ride or that Roe seemed intoxicated.  (*Id..,* p. 19).  The report also included a statement by Fayetteville Police Department Officer Stacy Dicus noting that Roe attempted to limit who Officer Dicus spoke with and that she was unable to communicate with Roe since their conversation on November 9, 2017.  *Id.*

Once Farrar received the Fayetteville Police Department report, he allowed both parties to review the report and make additional statements regarding the information contained within.  *Id.*  Farrar then issued his Letter of Decision, finding that "although there was evidence to indicate Roe may have been intoxicated, the evidence was insufficient to establish that it was more likely than not that Jane Roe was intoxicated to the point of incapacitation."  (*Id.*, p. 20).

Roe filed an appeal of Farrar's Letter of Decision.  (*Id.*, p. 21).  In her appeal, Roe challenged Farrar's finding that she was not incapacitated.  *Id.*  Roe's appeal explained:

> [I]t is to my understanding that the University defines sexual assault allegations within two categories: by force and through incapacitation.  I do not believe that these terms are mutually exclusive. I have stated this previously.  If an individual is incapacitated while someone performs sexual acts to them, those acts are subsequently 'by force' without question.

*Id.*  Doe received the appeal documents and sought clarification of the charges against him.  (*Id.,* p. 22*).*  Farrar told Doe that he would not know the full extent of the charges against him until the hearing.  *Id.*  Farrar reminded Doe that new and additional evidence may be submitted to the hearing panel.  *Id.*

Doe requested that Kristin Barnett, UA's Title IX Investigator, appear as one of his witnesses for the hearing.  *Id.*  However, Barnett chose not to attend the hearing.  *Id.*  The Title IX

hearing panel conducted a de novo hearing on April 23, 2018.  *Id.*  The Panel was comprised of Jon Comstock, Eric Specking, and Dina Wood.  (*Id.*, p. 23).  UA considered each panel member to be knowledgeable and trained on proper adjudication of Title IX issues.  *Id.*  At the beginning of the hearing Doe requested a continuance because Barnett was not present, and Roe was attempting to introduce new evidence he had not seen.  *Id.*  The panel denied this request.  *Id.* After hearing evidence from the parties, the panel determined that Roe became incapacitated at some time while she was at Doe's residence.  *Id.*  As a result, the panel voted two to one that the evidence established that it was more likely than not that Doe was responsible for sexual assault in violation of UA Policy 418.1.  (*Id.*, p. 24).  The panel noted that there was no evidence of consent and that it disregarded much of Doe's testimony because it determined that Doe's testimony "lacked credibility."  (*Id.*, p. 25).  The panel imposed "limited sanctions" including "Title IX training, ten hours of community service and an online sexual violence accountability course," because of the "extremely close factual determinations" made in Doe's case.  (*Id.*, p. 27).  Doe was placed on "conduct probation" pending his completion of the imposed sanctions.  *Id.*

Doe also alleges that UA was being investigated by the Department of Education Office of Civil Rights for failure to properly investigate prior claims of on-campus sexual behavior at the time of Doe's sexual assault adjudication.  *Id.*  Doe further asserts that various media outlets and student organizations were pressuring UA to change its adjudication process because UA was not adequately resolving sexual assault claims of female students against male students.  *Id.*  Doe claims that a highly publicized lawsuit against UA for its failure to properly adjudicate a Title IX complaint by a female against a male may have influenced the panel's decision.  *Id.*  Doe also alleges that after UA's initial finding of no violation in Doe's case, Roe began a media campaign criticizing the University's decision.  *Id.*  The campaign caused UA to issue a public statement.

*Id.* Doe alleges that Roe's media campaign and the public blowback from that campaign caused UA to sway the hearing panel decision in Roe's favor.

## II.     Standard of Review

To survive a motion to dismiss, a plaintiff must provide "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  The Court accepts Plaintiff's factual allegations as true. *Gallagher v. City of Clayton*, 699 F.3d 1013, 1016 (8th Cir. 2012).  A claim is plausible on its face if the "plaintiff pleads factual content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Factual allegations must be enough to raise a right to relief above the speculative level . . . ." *Bell Atl. Corp.*, 550 U.S. at 555 (2007).  Where the well-pleaded facts "do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Ashcroft*, 556 U.S. at 679 (2009)(internal quotations omitted).

## III.     Discussion

Doe brings two claims UA seeks to dismiss.  First, Doe alleges that UA engaged in procedures that violated his due process rights, including: 1) failing to give Doe proper notice of the charges against him on appeal; 2) allowing Roe to introduce new evidence at the appeal hearing; 3) utilizing a "single-investigator" model; 4) denying Doe "meaningful" cross-examination; 5) refusing to interview witnesses with exculpatory information; 6) utilizing the appeal hearing to readjudicate the matter; 7) improperly shifting the burden of proof to Doe in the hearing; 8) failing to properly train the hearing panel members; 9) using an improperly low standard of proof; and 10) allowing the hearing panel to act with actual bias.  Plaintiff also alleges

that UA violated the requirements of Title IX because it reached an "erroneous outcome" and it was "deliberately indifferent" to inequitable resolution of his sexual assault adjudication.

As an initial matter, both parties agree that the University of Arkansas can only be sued through the Board of Trustees. (Doc. 22, p. 2, n. 1). All claims against the University of Arkansas-Fayetteville are dismissed with prejudice. Doe also concedes that the University of Arkansas Board of Trustees cannot be sued for due process claims.[3] *Id.* Doe's due process claim against the University of Arkansas Board of Trustees is dismissed with prejudice. Doe further concedes that his due process claim against the official capacity defendants under § 1983 for money damages is impermissible. *Id.* Doe's claims against the official capacity defendants under § 1983 for money damages are dismissed. This leaves Doe's due process claims against the official and individual capacity defendants and his Title IX claim against the University of Arkansas Board of Trustees.

### A.    Procedural Due Process

Procedural due process requires that individuals are afforded certain minimum procedures before they are deprived of a liberty or property interest. *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). Generally, those minimum procedures must ensure that the individual has the opportunity to be heard at a meaningful time and in a meaningful manner. *Id.* at 333. In student disciplinary proceedings, the Eighth Circuit has held that an accused student is entitled at minimum to a pre-adjudication "notice, definite charge, and a hearing with opportunity to present one's own side of the case." *Esteban v. Cent. Mo. State Coll.*, 415 F.2d 1077, 1089-90 (8th Cir. 1969). The procedures provided are not to be measured by the standards that prevail for criminal law and

---

[3] Doe names the University of Arkansas Board of Trustees as a defendant in this action, but does not individually name each trustee. This distinction is unimportant in this case because a suit against a state employee in their official capacity is considered a suit against the State. *Zajrael v. Harmon*, 677 F.3d 353, 355 (8th Cir. 2012).

criminal procedure.  *Id.*  Courts should interfere only if there is a "clear case of constitutional infringement."  *Id.*

Due process is "flexible and calls for such procedural protections as the particular situation demands."  *Matthews*, 424 U.S. at 334 (internal quotations omitted).  Procedures employed to make determinations potentially depriving an individual of a property or liberty interest are tested on a case-by-case basis to determine if they were sufficient to provide due process in that instance. Courts consider: 1) the nature of the private interest affected by the deprivation; 2) the risk of erroneous deprivation in the current procedures used, and the probable value, if any, of additional or alternative procedures; and 3) the governmental interest involved, including the burden that additional procedures would entail.  *Id.* at 335.  With these factors as a guide, the Court must first determine whether Doe has a protected liberty or property interest that was deprived to implicate the Fourteenth Amendment due process clause.  If so, the Court must determine whether due process required UA to provide additional or different procedures than it provided during Doe's sexual assault adjudication.

Though he is proceeding under an anonym, for the purposes of this motion the Court accepts that Doe has a protected liberty interest here because the adverse disciplinary decision impugned his good name, reputation, and honor.  *See Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971) ("Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential.").  Because the due process clause is implicated, the Court must next determine what process Doe was due.

1.      Notice

Doe argues that UA failed to meet the minimum due process requirement of notice of the charges against him before he appeared at the appeal hearing.  The Eighth Circuit defines adequate notice as "oral or written notice of the charges against [the individual]."  *Keefe v. Adams*, 840 F.3d 523, 535 (8th Cir. 2016).  Doe received written notice of Roe's initial allegations and the issues challenged in Roe's appeal.  Roe's initial allegation, provided to Doe by Title IX Coordinator Tyler Farrar, states that Roe alleged that:

> [O]n or about Sunday, October 29, 2017, . . . [Doe] engaged in behavior that may be in violation of the University's Sexual Assault and Sexual Harassment Policy and the prohibition against sexual assault. Specifically [Jane Roe] has alleged that she believes sexual contact occurred while she was incapacitated and unable to give consent. [Jane Roe] has stated that she went to your residence in the early morning of October 29, 2017, and has little recollection of what occurred. However, [Jane Roe] has articulated that she believes you had sexual contact with her when she was too intoxicated to give verbal or implied consent.

The initial allegation notice apprised Doe of the date of the alleged incident, the actions founding the allegation, the claimant, and the UA policy Doe allegedly violated.  The allegations clearly provided both notice and a definite charge to Doe.  After Roe filed her appeal, Doe received a notice of appeal stating:

> [I]t is my understanding that the University defines sexual assault allegations within two categories: by force and through incapacitation.  I do not believe that these terms are mutually exclusive.  I have stated this previously.  If an individual is incapacitated while someone performs sexual acts to them, those acts are subsequently 'by force' without question.

Doe argues that he did not receive proper notice of the charges against him before the appeal hearing because Roe made a "new" allegation that Doe violated the sexual assault policy by assaulting her by force due to her incapacitation.  Doe's argument fails.  Regardless of how Roe semantically framed the issues on appeal, the appeal hearing was confined to the same incident alleged in the initial allegation notice, by the same complainant, regarding Roe's capacity to

12

consent to sexual activity.  Thus, Doe was provided notice and a definite charge of the issues to be resolved before the hearing panel and had the opportunity to prepare a defense for the hearing.

Doe cites *Navato v. Sletten*, 560 F.2d 340 (8th Cir. 1977) for the proposition that a decision-making body's consideration of allegations not included in the notice provided by the University creates a procedural due process violation.   However, Doe's proposed reading of *Navato* misapplies the holding set forth in that case to the facts alleged by Doe here.  In *Navato*, a medical resident at the University of Missouri Medical School was brought before the Residency Training Committee to defend himself against possible disciplinary action because of concerns submitted to the committee by his assigned supervisor.  At the meeting, the resident's supervisor detailed the concerns that she had submitted for review and the committee gave the resident time to respond to those concerns.  The resident and his supervisor then left the meeting.  However, the committee proceeded to discuss not only the resident's supervisor's assessment of the resident's performance over a three-month period, but also other evaluations of the resident made by other medical instructors in the program over a year and a half period.  In its final recommendation, the committee not only included the concerns submitted by the resident's supervisor, but also negative evaluations of the other instructors, of which the resident had not seen or been given the opportunity to respond to.

As a result, the Eighth Circuit held that because the medical resident was only given notice and an opportunity to respond to the concerns submitted by his supervisor during a three-month period, he was denied due process by the medical school when it included the negative evaluations of the other instructors in its findings and disciplinary recommendation without giving the resident the opportunity to respond to those evaluations.

13

Thus, contrary to Doe's reading of the case, *Navato* and Doe's case are factually and procedurally dissimilar.  In Doe's adjudication, the initial allegation, the investigation, Roe's appeal, and the appeal hearing all featured the same incident, the same parties, and the same UA policy.  Doe was given the opportunity to respond to the accusations before Farrar made his initial determination and again before the hearing panel issued its decision.  Doe's entire adjudication process ultimately hinged on the fact-finder's determination of Roe's level of incapacitation the night the two engaged in sexual activity and her ability to consent to that sexual activity as a result. Doe was aware of that when he met with Farrar in the pre-determination meetings and he was aware of that when he attended the appeal hearing.  Doe was able to prepare his defense and rebut the accusations made by Roe regarding the events that occurred on the night in question and Roe's level of incapacitation during the interaction.  Thus, UA met the basic requirement of providing Doe adequate notice throughout Doe's proceedings.

### 2.    New Evidence at the Appeal Hearing

Doe alleges that UA failed to satisfy his procedural due process rights by allowing Roe to introduce new evidence at the appeal hearing.  UA sexual assault resolution policies allow both parties to present new evidence at the appeal hearing.  This allows both parties a meaningful opportunity to be heard before the hearing panel makes its final decision.

Applying the *Mathews* factors, Doe has a protected liberty interest in his good name and character that was affected because of the adverse outcome of the de novo appeal hearing.  The risk of erroneous deprivation is minimal in allowing the parties to introduce new evidence. Hearing panel members are provided with the Final Investigative Report and the Title IX Coordinator's Letter of Decision.  The panel is then able to hear testimony and view evidence presented at the hearing.  By completing a de novo review in front of a mixed-gender panel of

14

three adjudicators, the parties are given more opportunity to argue their side and ensure that the final decision makers have all of the evidence when making their determination.  This should minimize the risk of erroneous deprivation.  Alternatively, by limiting the appeal hearing panel to only reviewing the Title IX Coordinator's application of the facts to the sexual assault policy, the three-member panel would be required to accept the Title IX Coordinator's finding of fact, even if it were in error or underdeveloped.  Thus, allowing parties to present new evidence only increases the possibility of a correct determination and certainly satisfies the minimum procedural due process right to have a meaningful opportunity to be heard.  Therefore, UA's procedure of allowing a second opportunity to present evidence before a neutral fact finder satisfies procedural due process.

### 3.  Single-Investigator Model

Doe argues that UA's single-investigator model for sexual assault cases also failed to satisfy his due process rights.  Doe asserts that if he had been given a live hearing and the right to cross-examine Roe, he would have been able to more appropriately develop the record for the Title IX Coordinator and the hearing panel to make their decision.  However, Doe had the opportunity, not only during the initial investigation but also during the appeal hearing, to more fully develop the record.  Doe took advantage of this opportunity during Barnett's investigation by submitting questions to Barnett that he wanted Roe to answer.  Farrar, UA's Title IX Coordinator, also gave Doe multiple opportunities to review evidence collected in the investigation and provide a statement.  The complaint does not reflect that Doe took that opportunity.  Doe then had the opportunity to share his side of the story and highlight evidence supporting his defense before the three-member appeal hearing panel.  Doe was permitted to submit questions to the hearing panel

to be asked of Roe.  Although the panel had discretion to review the questions and ask only those they deemed to be relevant, Doe was again included in the process.

UA's investigation and resolution process included Doe every step of the way and allowed him multiple opportunities to further develop the record and ensure that Roe was adequately questioned.  *See Doe v. Brown Univ.*, 210 F. Supp. 3d 310, 332 (D.R.I. 2016) ("Brown's choice to have a trained investigator conduct the investigation is reasonable, as is maintaining a three-person panel to make the final decision.").  Allowing the accused or his advisor to directly cross-examine the complainant might serve to prevent an erroneous deprivation of his liberty interest at times, but UA also has an overwhelming interest in protecting potential victims of sexual assault from cross-examination that may be traumatic or intimidating, which could escalate or perpetuate a hostile environment on campus.  U.S. DEP'T OF ED., OFFICE FOR CIVIL RIGHTS, DEAR COLLEAGUE LETTER 12 (Apr. 4, 2011).

Doe argues that this Court should look to *Doe v. Univ. of Mich.*, 325 F. Supp. 3d 821 (E.D. Mich. 2018) as evidence that a "single-investigator" model denies due process.  However, Doe fails to note that not all "single-investigator" sexual assault resolution models are utilized in the same manner.  The University of Michigan's sexual assault resolution policy operated much differently than the policy in place at UA during the time of Doe's sexual assault adjudication. Michigan's policy did not allow for the accused to receive a live hearing where he could confront the accuser and submit questions to the hearing panel to be asked of the accuser and other witnesses.  It was solely because Michigan's policy did not allow for such a live hearing before the adjudication became final, that the district court held that Michigan's "single-investigator" policy likely violated procedural due process.  *Doe*, 325 F. Supp. 3d at 828.  In contrast, after UA used a single-investigator for its initial investigation, the university still provided Doe the

opportunity to appear at the appeal hearing before making his adjudication final.  He was able to submit cross-examination questions to the panel to be asked of Roe and the hearing panel members were able to ask probing questions of Roe and other witnesses to resolve factual and credibility issues in the case.  Because of the distinct variations between Michigan and UA's use of the single-investigator models in their sexual assault resolution policies, *Doe v. Univ. of Michigan* presents procedural due process issues that simply are not present in Doe's case.  UA's current procedure strikes an appropriate balance by including the accused in the process during the investigation and appeals hearing, while protecting potential victims from being traumatically cross-examined by the accused.  UA's "single-investigator model," as a part of its sexual assault resolution process satisfied Doe's right to procedural due process.

### 4.    "Meaningful" Cross-Examination

Doe alleges that he was denied procedural due process because he was prevented from cross-examining Roe to test her memory, intelligence, or ulterior motives.  However, Doe was afforded an opportunity to submit questions to the hearing panel for cross-examination of Roe and other witnesses.  Notably, this procedure is in line with the Department of Education Office for Civil Rights guidance and a majority of circuits that have determined that procedural due process only requires a limited form of cross-examination in student disciplinary proceedings.  *See Goss v. Lopez,* 419 U.S. 565, 583 (1975); *Greenhill v. Bailey*, 519 F.2d 5, 9 (8th Cir. 1975); *Gorman v. Univ. of R.I.*, 837 F.2d 7, 16 (1st Cir. 1988) ("[T]he right to unlimited cross-examination has not be deemed an essential requirement of due process in school disciplinary cases."); *Winnick v. Manning*, 460 F.2d 545, 549 (2d Cir. 1972) ("Due process does not invariably require the procedural safeguards accorded in a criminal proceeding . . . ."); *Doe v. Cummins*, 662 F. App'x 437, 448 (6th Cir. 2016) (holding that even in a case where limited cross-examination may be

17

required to resolve credibility of a witness, submission of questions by Defendant to hearing panel for cross-examination satisfied due process); U.S. DEP'T OF ED., OFFICE FOR CIVIL RIGHTS, DEAR COLLEAGUE LETTER 12 (Apr. 4, 2011). Doe suggests that the Court follow the guidance of *Dillon v. Pulaski Cty. Special Sch. Dist.*, 594 F.2d 699, 700 (8th Cir. 1979). However, *Dillon* is distinguishable because the student in *Dillon* was not allowed to call the accuser as a witness during the expulsion hearing to have her questioned to help resolve disputed issues of fact. Here, Roe took the stand and the hearing panel was able to ask her questions regarding the disputed factual issues. Doe was even allowed to submit questions to the panel that they could use to question Roe. In appeal hearings, the school has an undeniable interest in protecting the accuser from being confronted by the accused. It would place a significant burden on the school to require it to allow the accused to confront their accuser with no evidentiary protections, and such questioning would have little added benefit to the fact-finding mission of the hearing. Even if procedural due process required that Doe be allowed to seek limited cross-examination of the witness, UA satisfied that requirement in allowing Doe to submit cross-examination questions to be used in questioning Roe at the hearing panel's discretion.

### 5.    Failing to Interview Witnesses with Potential Exculpatory Information

Doe alleges that UA violated his due process rights by Barnett failing to interview witnesses with potentially exculpatory information. However, Doe fails to explain how his due process rights were denied by Barnett's choice not to interview all suggested witnesses. Doe was allowed to share his side of the story with Farrar and Barnett and declined to make a statement. Due process surely does not require that the UA track down all potential witnesses that a party believes has information in a given case. To require a university to do so would place an incredibly difficult burden on the university to complete its investigations in an efficient manner as required

18

by Title IX.  Barnett is a trained Title IX investigator and made the professional determination that interviewing additional witnesses was unnecessary to complete her investigation.  Because the appeal hearing was not governed by the rules of evidence, Doe could have testified about what Roe may have told the witnesses regarding the incident.  Furthermore, because the appeal hearing reviews the facts de novo, Doe could have brought the witnesses Barnett allegedly excluded from her report before the hearing panel.  Doe was permitted a meaningful opportunity to be heard.  Given the significant burden interviewing all suggested witnesses would have on universities in completing sexual assault investigations in a prompt and equitable manner, due process did not require that Barnett interview every witness with potentially exculpatory information.

### 6.    Utilizing the Appeal Hearing to Re-adjudicate the Matter

Doe alleges that UA violated his due process rights by utilizing the appeal to "re-adjudicate" the matter.  Doe cites *Tanyi v. Appalachian State Univ.*, No. 5:14-CV-170RLV, 2015 WL 4478853 (W.D.N.C. July 22, 2015) in support.  The ruling in *Tanyi* was influenced by the double jeopardy clause of the Fifth Amendment and indicates that when a second hearing is held after a first hearing is final, the second hearing does not comport with due process because it only exists because the adjudicator did not like the first hearing's results.  *But see Justices of Boston Mun. Court v. Lydon*, 466 U.S. 294, 309 (1984) (enlarged, fact-sensitive second stage de novo proceeding as part of same initial process gives more, rather than less, of the process due).

 UA allows either party that disagrees with the Title IX Coordinator's Letter of Decision to appeal to a hearing panel.  In accordance with the "Dear Colleague Letter" from the Department of Education, UA allows for de novo review.  This allows the hearing panel to review the facts before them and apply them to the policy as they deem appropriate.  Just because the hearing panel interpreted UA's sexual assault policy differently than the Title IX Coordinator does not mean that

UA "re-adjudicated" the matter.  To the contrary, before the appeal hearing, Doe received notice of the appeal, what he was being charged with, and was given an opportunity to present his side of the story.  By permitting appeals from both parties, the submission of additional facts and argument UA ensured that both parties had more process than the minimum due before a final determination was made.  *See Justices of Boston Mun. Court*, 466 U.S. at 309.

      **7.**      **Improperly Shifting the Burden of Proof to Doe in the Hearing**

Doe alleges that the hearing panel improperly shifted the burden of proof to Doe by stating in its decision that the record on the part of the Complainant is "absent of any evidence of consent." (Doc. 22, p. 13).  However, it does not appear, without reviewing the panel's complete findings, that the panel shifted the burden of proof.  Rather, in making its determination of whether it was more likely than not that Doe violated the policy, the hearing panel determined that at some point during her time at Doe's apartment, Roe became intoxicated and was incapacitated during the sexual encounter.  Doe asserts that the panel's opinion examining whether there was "evidence of consent" versus a "lack of consent" shows that the panel improperly shifted the burden of proof to Doe.  However, the panel's choice of wording, stating that the record "is absent of any evidence of consent" emphatically conveys that there was a lack of consent in violation of the policy.

The panel disregarded large portions of Doe's testimony because they did not find him credible.  (Doc. 1, pp. 24-25).  The hearing panel did not place the burden of proof on either party, but based on the evidence presented before them, determined that the greater weight of credible evidence made it more likely than not that Doe violated UA's sexual assault policy.  This comports with UA's resolution policy and due process requirements.

### 8. Failing to Properly Train the Hearing Panel Members

Doe alleges in turn that the panel's failure to apply UA's sexual assault resolution policy demonstrates a failure to train by UA. To establish a failure-to-train claim under § 1983, the plaintiff must show that the Board's failure to train its employees in a relevant respect evidences deliberate indifference to the rights of students. *Plamp v. Mitchell Sch. Dist. No. 17-2*, 565 F.3d 450, 462 (8th Cir. 2009). The University "must have notice that its procedures were inadequate and likely to result in a violation of constitutional rights." *Id.* Defendants correctly point out that Doe has not alleged any facts that demonstrate that UA had knowledge that its hearing panel training procedures were inadequate. To the contrary, UA's policy is that hearing panel members must be trained in adjudicating sexual assault claims before being placed on a panel. Doe points to previous cases where UA failed to "meet its obligations" under Title IX as further evidence that UA did not train the hearing panel members in this case properly. However, Doe does not identify one instance where a failure to adequately train hearing panel members led to an inappropriate resolution of a sexual assault appeal. As a result, Doe has not demonstrated that UA was on notice that its hearing panel training procedures were inadequate and likely to result in violation of a constitutional right. Doe fails to state a plausible failure-to-train claim.

### 9. Using an Improperly Low Standard of Proof

Doe alleges that UA violated due process by employing an improper standard of proof during the proceedings. Doe fails to argue how the preponderance of the evidence standard, utilized in similar sexual misconduct civil actions, denies due process.[4] School disciplinary proceedings are not criminal trials. Standards such a clear and convincing evidence and beyond

---

[4] If Roe had filed a civil action in Arkansas state court alleging that Doe committed sexual battery through his actions, Roe would have to prove her claim for damages by a preponderance of the evidence. AMI Civ. 418 (2018); AMI Civ. 202 (2018).

reasonable doubt are not required in such a civil proceeding.  In sex discrimination cases in the Title VII context, the Supreme Court has typically applied the preponderance of the evidence standard in resolving claims.  *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99 (2003).  The Department of Education and courts have determined that case law interpreting Title VII of the Civil Rights Act of 1964 is the appropriate guide to resolution of Title IX claims.  *Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007).  Preponderance of the evidence is the prevailing standard used in Title IX student-on-student harassment claims.

Doe argues that utilizing a preponderance of the evidence standard does not afford due process because of the significant liberty interest at stake in sexual assault adjudications.  Adverse sexual assault adjudications certainly may result in expulsion from school and a severely impugned character that could substantially alter a student's future career plans.  However, such adjudications do not result in deprivations of physical liberty or fundamental rights.  Sexual assault adjudications, like sexual harassment claims under Title VII and state law sexual battery claims, do not require courts to elevate the governing evidentiary standard from preponderance of the evidence.

### 10.    Hearing Panel Acted with Actual Bias

Finally, Doe argues that his due process rights were violated because the hearing panel acted with actual bias.  To state a claim for actual bias, the plaintiff must demonstrate that the hearing panel acted with actual bias as a result of personal animosity, illegal prejudice, or a personal or financial stake in the outcome.  *Ikpeazu v. Univ. of Neb.*, 775 F.2d 250, 254 (8th Cir. 1985); *Doe v. Trs. of Boston Coll.*, 892 F.3d 67, 84 (1st Cir. 2018) (applying Eighth Circuit actual bias standard for academic appeal hearing panel members to a sexual assault resolution hearing panel).  Hearing panel members are given the presumption of honesty and integrity.  *Ikpeazu,* 775

F.2d at 254.  Defendant has failed to overcome this presumption with any facts demonstrating that the panel members acted with personal animosity, prejudice, or a personal or financial stake in the outcome of the hearing.  Simply alleging that panel members *may* have accepted Roe's version of the truth because she was a female or led a campus movement publicly challenging the Title IX Coordinator's initial decision does not convert a possible claim of actual bias to a plausible one.

## B.        Substantive Due Process

Doe argues that he was denied substantive due process under the Fourteenth Amendment. "The substantive component of the due process clause protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition and are implicit in the concept of ordered liberty . . . ."  *Singleton v. Cecil*, 176 F.3d 419, 425 (8th Cir. 1999) (internal quotations omitted).  Substantive due process protections are generally accorded for matters related to marriage, family, procreation, and the right to bodily integrity.  *Id.*  Doe's claim fails to allege a fundamental right.  Substantive due process does not protect the deprivation of Doe's good name and character.  Even if the Court were to find that Doe alleged a fundamental right, Doe's claim still fails.  To establish a substantive due process claim, the plaintiff must demonstrate that the government's conduct in depriving him of his education is so outrageous that it shocks the conscience, offends judicial notions of fairness, or is offensive to human dignity.  *Moran v. Clarke*, 296 F.3d 638, 643 (8th Cir. 2002).

There is nothing alleged in Doe's complaint that shocks the conscience or offends judicial notions of fairness.  Doe attempts to use the hearing panel's decision to weigh some pieces of evidence more strongly than others as evidence that the hearing panel acted in an unfair or arbitrary manner.  However, credibility determinations are fully within the purview of a university discipline hearing panel conducting a de novo review.  *Doe v. Coll. of Wooster*, 243 F. Supp. 3d 875, 894

(N.D. Ohio 2017) ("As for assessing the credibility of hearing witnesses, such a determination is well within the discretion of the disciplinary board, and is not for the courts to second guess."). There was evidence to support that Roe had consumed alcohol during the party she attended and evidence to support that Roe may have become intoxicated to the point of incapacitation while at Doe's apartment.   That the hearing panel accepted this evidence and made an adverse determination to Doe does not mean that their conduct was unfair.  To the contrary, their conduct was in line with prevailing legal requirements[5] and their fact-finding duties.  Doe fails to state a claim for a violation of substantive due process.

### C.     Title IX

In his complaint, Doe alleges claims under Title IX arguing that the hearing panel decision was an "erroneous outcome" and that UA was "deliberately indifferent" to the efficient and equitable resolution of his sexual assault adjudication.  UA's motion sought dismissal of both Title IX claims.  Doe's response only addressed the erroneous outcome claim and as a result, Doe has abandoned his deliberate indifference claim.  Furthermore, because Doe has not alleged any facts from which it could be inferred that UA knew of prior defective Title IX hearings, Doe could not prove deliberate indifference in any case.  *Gebser v. Lago Vista Ind. Sch. Dist.*, 524 U.S. 274, 290 (1998); *K.T. v. Culver-Stockton Coll.*, 865 F.3d 1054, 1057 (8th Cir. 2017).  Thus, Doe's deliberate indifference claim will be dismissed with prejudice.

---

[5]In civil jury trials, the Eighth Circuit pattern jury instructions encourage jurors, as fact-finders, to "decide what testimony [they] believe and what testimony [they] do not believe."  Jurors may "believe all of what a witness said, or only part of it, or none of it."  Eighth Circuit Model Jury Instruction No. 3.03.  The hearing panel members, as fact-finders during the de novo appeal hearing, appear to have made such credibility determinations, and concluded that much of Doe's testimony regarding Roe's level of incapacitation was not credible.

Doe argues that he has a valid "erroneous outcome" claim against UA and the individual defendants.  Doe cannot maintain a Title IX action against the individual capacity defendants because they are not "federal grant recipients." *Cox v. Sugg*, 484 F.3d 1062, 1066 (8th Cir. 2007). Doe's Title IX "erroneous outcome" claim against the individual capacity defendants is dismissed with prejudice.

To establish an erroneous outcome claim, the plaintiff must show: "1) evidence illustrating an 'articulable doubt' as to the accuracy of the outcome of the proceeding; and 2) particular circumstances showing gender bias was a motivating factor in the erroneous outcome." *Rossley v. Drake Univ.*, 342 F.Supp.3d 904, 924 (S.D. Iowa 2018).  To show "articulable doubt," in the outcome of the hearing panel, the plaintiff must demonstrate evidentiary weaknesses behind the finding of the offense such as a motive to lie, particular strengths of the defense, or procedural flaws affecting the record.  After satisfying this showing, the Plaintiff must also demonstrate that the panel acted because of gender bias by "identifying statements by members of the disciplinary tribunal, . . . pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Id.*; *Doe v. St. John's Univ.*, No. 17-2416, 2017 WL 4863066 (D. Minn. 2017).

First, Doe has failed to sufficiently allege articulable doubt on the accuracy of the hearing panel outcome.  Although Doe has identified that the hearing panel made a credibility determination to decide which version of events to believe, Doe fails to put forth corroborating evidence that his side of the events is particularly more believable on the issue of incapacitation. UA procedures comported with due process requirements and Department of Education Title IX guidance.  Thus, Doe has failed to allege articulable doubt to the accuracy of the outcome of the proceeding.

Even if Doe had sufficiently alleged articulable doubt, Doe has failed to plausibly allege that gender bias was a motivating factor for the erroneous outcome. Doe asserts that UA's Title IX Investigator was biased against males. However, Farrar, UA's Title IX Coordinator, used Barnett's report to initially determine that Doe was not responsible for a sexual assault violation, so bias does not appear to have affected the contents of Barnett's investigation. Doe also alleges that this outcome was influenced by federal, state, and local pressure, including Roe's involvement in a campus-wide sexual assault campaign after the Title IX coordinator's initial decision in Doe's case. However, Doe has failed to present sufficient evidence to link UA's past Title IX cases, Roe's campus movement, and UA's response to Roe's movement to gender bias on the part of the hearing panel in this case. Doe attempts to link his adverse outcome to gender bias by alleging a "pattern of discrimination" by UA against males in Title IX cases because "in the time since the criticism and scrutiny of the University began, the University has found a violation in the overwhelming majority of cases where a female student alleges sexual assault by a male student." (Doc. 22, p. 24). However, this allegation does not prove a pattern of gender bias, but only that a majority of the sexual assault claims recently alleged by female students against male students were meritorious. *See Doe v. Univ. of St. Thomas*, 240 F. Supp. 3d 984, 991 (D. Minn. 2017) ("[N]umerous courts have held a court 'cannot plausibly infer . . . a higher rate of sexual assaults committed by men against women . . . indicates discriminatory treatment of males accused of sexual assault."). Thus, Doe fails to allege a plausible erroneous outcome claim.

### D.    Qualified Immunity

UA asserts that the individual capacity defendants are entitled to qualified immunity. Qualified immunity "shields government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable

person would have known." *Crow v. Montgomery*, 403 F.3d 598, 601 (8th Cir. 2005). The issue of qualified immunity need only be addressed if the government actor's conduct violated a constitutional right. *Id.* If the conduct as alleged would violate a constitutional right, the Court then inquires into "whether the right was clearly established." *Id.* Because Doe has not alleged facts that show a constitutional violation it is unnecessary to address the parties' qualified immunity arguments.

### E.    Quasi-Judicial Immunity

UA also asserts that appeal hearing members Jon Comstock, Eric Specking, and Dina Wood, in their individual capacities, are entitled to quasi-judicial immunity. Quasi-judicial immunity provides absolute immunity from suit for "persons who perform quasi-judicial functions." *VanHorn v. Oelschlager*, 457 F.3d 844, 847 (8th Cir. 2006). The Eighth Circuit considers an official's function a "quasi-judicial function" if the functions are "similar to the judicial process," "likely to result in lawsuits for damages by disappointed parties, and sufficient safeguards exist in the regulatory framework to control unconstitutional conduct." *Id.*

Here, individual capacity defendants Comstock, Specking and Wood, as appeal hearing panel members, are entitled to quasi-judicial immunity. Comstock, Specking and Wood served in an official function similar to the judicial process. The panel members heard evidence, engaged in questioning of witnesses, made findings of facts and applied those findings to UA policy before issuing a final decision and sanctions. The hearing panel members are in a position where an adverse decision on their part may result in a § 1983 lawsuit for damages by disappointed students, such as the instant claim. Finally, Title IX regulations and the due process clause of the Fourteenth Amendment work in conjunction to ensure that hearing panel members and university officials act

constitutionally in adjudicating sexual assault claims.  Thus, Comstock, Specking, and Wood, in their individual capacities, are each entitled to quasi-judicial immunity from suit.

IT IS THEREFORE ORDERED that Defendants' motion (Doc. 17) to dismiss is GRANTED and Doe's due process claims under § 1983 and Title IX claims are DIMISSED with prejudice against all defendants.

Judgment will be entered separately.

IT IS SO ORDERED this 3rd day of April, 2019.

*/s/ P. K. Holmes,* III
P.K. HOLMES, III
U.S. DISTRICT JUDGE